STATE of Missouri, Respondent,

v.

David VALENTINE, Appellant.

No. 60349.

Supreme Court of Missouri,
En Banc.

July 17, 1979.

Norman A. Selner, Clayton, for appellant.

John D. Ashcroft, Atty. Gen., Paul Robert Otto, Asst. Atty. Gen., Jefferson City, Eric M. Martin, Asst. Atty. Gen., St. Louis, for respondent.

RENDLEN, Judge.

David Valentine appeals his convictions of robbery in the first degree, § 560.120, RSMo 1969, and armed criminal action, § 559.225, RSMo Supp.1976, contending: (1) the armed criminal action charge under § 559.225 violates the constitutional protection against being twice put in jeopardy for the same offense, the statute is invalid under art. III, §§ 23 and 28, Mo.Const., and finally it is impermissibly vague and indefinite; (2) the court erred in permitting an eyewitness' in-court identification and testimony as to her out-of-court identification; and (3) the court improperly admitted certain evidence seized in violation of appellant's state and federal constitutional rights. The action was brought and appeal taken prior to the effective date of the newly adopted judicial article of the Missouri Constitution (January 2, 1979) and because it arguably could be said to involve certain issues requiring construction of constitutional provisions, we will entertain the cause under our appellate jurisdiction established in Mo.Const. art. V, § 3 (as amended 1970). We affirm.

On December 17, 1976, about six o'clock in the evening, a black male 25–30 years in age, approximately six feet two inches in height with a thin build and short Afrostyle haircut entered the Tip Top Cleaners on Clayton Road in Richmond Heights, Missouri. Showing the clerk, Patricia Edwards, a pair of tan slacks he asked whether they could be cleaned the following day and when told they could, he produced a pistol and demanded the cash in the register. As soon as Miss Edwards complied, he ran from the front door with the money. At the time of this incident it was dark outside and the interior of the establishment was lighted. No other individuals were present in that part of the building and a fellow employee in the rear was unaware of the robbery at the time. Patricia Edwards notified the police of the robbery and provided them the gunman's description.

Approximately one month later, on January 14, 1977, Detective Gerald Mueller of the University City Police was on a stakeout in an unmarked car about 5:30 p. m. in the 7500 block of Delmar Blvd. Several other officers were in the vicinity in unmarked cars near cleaning establishments in an effort to find the person or persons responsible for ten or eleven armed robberies in the preceding three to four weeks. Most of these robberies had occurred between five and six in the evening. The police thought two persons might be involved. Four composite pictures of holdup suspects had been prepared, and Detective Mueller was familiar with all of them. One of these pictures was prepared from Miss Edwards' description.

During the stakeout Detective Mueller heard another detective say in a radio transmission that he had observed a white Mustang make several passes in front of one cleaning establishment near Mueller's location. The detective stated it was suspicious and he was going to follow the auto; Detective Mueller moved in to help. A police captain patrolling in an unmarked car pulled behind the Mustang and stated in a radio transmission he intended to stop it and Mueller reached the location in time to assist. Detective Mueller observed no traffic violations or other infraction by the driver of the Mustang before it was stopped.

Appellant Valentine was driving the auto. The officers approached him with guns drawn and ordered him to the back of the car, where they patted him down for weapons. Shortly after he was stopped and before Detective Mueller searched the auto, appellant was advised he was under arrest. Observing appellant as he alighted from the car, Detective Mueller noted his resemblance to one of the composite photos. Also, appellant stated he was going to the Inner Belt (west of the arrest scene), but when arrested he was traveling eastward. One of the descriptions of suspects had mentioned a flat top hat, and when stopped, appellant was wearing a hat of that type.

Upon appellant's arrest, his car was to be towed and pursuant to the standard procedure of the University City Police, Detective Mueller searched the interior of the vehicle finding a .25-caliber automatic pistol hidden near the firewall just above the transmission hump where part of the heater was missing. Appellant was conveyed to the St. Louis County jail following booking at University City police headquarters. After having been given his *"Miranda"* warning and having signed a waiver form, appellant admitted that he participated in the robbery of the Tip Top Cleaners, but stated he merely drove the getaway car and that a friend, known to him only as Leroy, was his accomplice.

At the hearing on appellant's motion to suppress identification testimony and physical evidence, Patrica Edwards testified that about 10:00 p. m. on the night of appellant's arrest, Detective Ronald Pfeiffer of the Richmond Heights police stopped at Miss Edwards' residence and asked her to accompany him to a lineup. There she looked at each of the men and identified appellant as the man who had robbed her that day. Miss Edwards testified appellant was the only man in the lineup who fit her description of the robber.

At trial, witness Edwards identified appellant to the jury as the armed robber without objection and testified without objection to her previous identification of him at the lineup. In addition, the State introduced, over appellant's objection, the pistol found in defendant's automobile, and Patricia Edwards was quite positive in her iden-

tification of the pistol as that used in the robbery.

## I.

Appellant's multi-faceted attack on the armed criminal action statute, § 559.225,[1] RSMo Supp.1976, begins with the novel argument that the statute violates art. III, § 23 of the Missouri Constitution by addressing more than one subject,[2] arguing that it does so by purporting to embrace every felony in which a weapon may be used and that these felonies comprise the numerous "subjects" of the armed criminal action law. Appellant's semantical argument is without merit. The armed criminal action statute no more addresses many subjects than does the conspiracy statute (§ 564.016, RSMo 1978), the aiding and abetting statute (§ 562.041, RSMo 1978), or the felony murder statute (§ 565.003, RSMo 1978). These and similar statutes make criminal and proscribe certain behavior done in connection with other crimes. Specifically, armed criminal action focuses on the use of dangerous or deadly weapons in felonies. This complies with the purpose of art. III, § 23, to limit a bill to one general subject and to afford reasonably definite information to legislators and the public concerning the subject matter of a legislative act. Accordingly, appellant's argument fails. *State ex rel. Taylor v. Wade,* 360 Mo. 895, 231 S.W.2d 179 (banc 1950); *Graff v. Priest,* 356 Mo. 401, 201 S.W.2d 945 (1947). Appellant further contends the title of the bill enacting the armed criminal action statute[3] violates the

---

1. Section 559.225 was reclassified in the new criminal code as § 571.016, RSMo 1978. It reads in relevant part: "[A]ny person who commits any felony under the laws of this state by, with, or through the use, assistance, or aid of a dangerous or deadly weapon is also guilty of the crime of armed criminal action . . ."

2. Article III, § 23 reads in part: "No bill shall contain more than one subject which shall be clearly expressed in its title . . . ."

3. The title of Conference Committee Substitute for H.B. 1231, 997, 1024, 1116, 1332, 1346 (78th General Assembly) is as follows:

"An Act to repeal section 556.140, RSMo 1969, relating to the commission of certain crimes with certain weapons, and to enact in lieu thereof one new section relating to the same subject, with penalty provisions." Laws of 1976, p. 780.

The title conforms to the Missouri Constitution, 1945, and applicable rules of the General Assembly. See Rule 110, 78th General Assembly and 7 Cannon, Rules and Practice of the House of Representatives of the United States, 87th Congress, §§ 1035, 1254, 1489. In *State ex rel. Toedebusch v. Public Service Commission,* 520 S.W.2d 38, 43 (Mo. Banc 1975), citing *508 Chestnut, Inc. v. City of St. Louis,* 389 S.W.2d 823 (Mo.1965), the court held:

mandate of art. III, § 23, that "no bill shall contain more than one subject which shall be clearly expressed in its title . . . ." The argument is premised on his prior contention that the bill attempts to amend other statutes by indirect reference. For the reasons discussed above, appellant's argument as to the bill's title must also fail.

■ Appellant also claims that the statute, in violation of art. III, § 28 of the Missouri Constitution, invalidly attempts to amend many other statutes without setting forth in full the statutes so amended. This argument, as novel as the first, is similarly meritless. This Court in *State v. Treadway*, 558 S.W.2d 646, 652 (Mo. banc 1977), held that armed criminal action constitutes an offense separate and distinct from other offenses. Hence, the statute neither amends other felony statutes nor offends art. III, § 28.

■ It is next urged that charges of armed criminal action and armed robbery arising from the same incident put him twice in jeopardy for the same offense in violation of the fifth amendment to the United States Constitution and art. I, § 19 of the Missouri Constitution. Because the crime of robbery was committed only through the use of a deadly weapon—that is, the "putting in fear" element of the crime of robbery was accomplished only by brandishing a pistol—appellant argues the crime of armed criminal action does not comprise a distinct, separate offense in this case. In *Treadway*, this Court rejected an identical argument and in so doing compared the elements of first degree robbery (§ 560.120, RSMo 1969) (of which appellant here has been convicted) and armed criminal action, concluding that each crime contained elements not found in the other. 558 S.W.2d at 651–52. However, appellant claims that *Treadway* ignored the language of the pen-

alty statute for first degree robbery, § 560.-135,[4] RSMo 1969. That statute singled out robberies committed by means of dangerous or deadly weapons and explicitly set the same punishment for those robberies as well as for robberies committed "by any other means." *Treadway* in appellant's view ignores the legislative intent evidenced in § 560.135 that the punishment for robbery *not* be enhanced when a gun is used.

The principal flaw in appellant's attack on *Treadway* is that it does not advance his double jeopardy claim. Whatever the legislative intent as to punishment for first degree robbery, the legislative result of the armed criminal action statute has been (as held in *Treadway*) to create a separate and distinct crime. Therefore appellant Valentine was not twice put in jeopardy for the same offense.

■ Finally, appellant presses the argument that § 559.225 is void for vagueness. From the brief we glean that appellant refers to the sentencing provisions applicable to second and third offenders under subsections 2 and 3 of the statute and to eligibility for parole under subsection 1. But appellant does not relate these provisions to his conviction, nor do we perceive from the record how they apply to the rights of appellant in this case. Such questions, if they have value, must await consideration in a proper case. One "to whom application of a statute is constitutional" cannot ordinarily raise the claims of others against whom "its application might be unconstitutional." *United States v. Raines*, 362 U.S. 17, 21, 80 S.Ct. 519, 522, 4 L.Ed.2d 524 (1960). The contention is denied.

## II.

■ Appellant's second attack on his conviction involves Patricia Edwards' trial

---

" 'The object of the requirement is that "the title, like a guideboard, indicate the general contents of the bill, and contain but one general subject, which might be expressed in a few or a greater number of words." ' "

**4.** Section 560.135 read in relevant part: "Every person convicted of robbery in the first degree

by means of a dangerous and deadly weapon and every person convicted of robbery in the first degree by any other means shall be punished by imprisonment . . . ." Chapter 558, RSMo 1978, now prescribes the terms of imprisonments.

identification testimony. Although appellant's brief concentrates on the allegedly suspect quality of the lineup about which Miss Edwards testified, appellant's contention that the lineup was unduly suggestive has not been preserved for appeal as counsel did not object to such testimony at trial. *State v. Holt*, 465 S.W.2d 602, 604 (Mo. 1971). Nor did counsel object to the in-court identification. Further, in his opening statement and final argument to the jury, defense counsel referred to the alleged lineup deficiencies urging that Edwards had unwittingly been led to select appellant as the robber and asked the jury to conclude her identification was erroneous. Since counsel chose not to object but instead to exploit the alleged deficiencies at trial, appellant may not now be heard to complain of a chosen trial strategy. If it were otherwise the accused could trap the trial court with "error" of the accused's own making or in which he joined or acquiesced.

On the other hand, counsel vigorously objected to the prosecution's attempt to bolster Patricia Edwards' identifications and now argues the court erred by allowing it. The challenged sequence of questions and answers was as follows:

Q. (Mr. Adler) Pat, in the month immediately preceeding [sic] December 17, 1976, right before, how many times were you robbed?

A. Twice.

Q. Now this Defendant is not the person that committed either of those robberies, is that correct?

A. Right.

Q. When those robberies were committed, did the police come and take reports?

A. Yes.

Q. And did they ask you certain questions?

A. Yes.

Q. They asked you to describe the person?

A. Yes.

Q. Did they ask you to tell them his height?

A. Yes.

Q. His weight? and his build?

A. (Nods.)

Q. Did they ask you about guns?

A. Yes.

* * * * * *

Q. Did you remember the questions the police asked you when you were looking at the person who was robbing you December 17, 1976?

A. Yes.

Appellant contends that this line of inquiry introduced evidence of prior crimes and (1) "implied the highly questionable and prejudicial proposition that the identification witness was a cool and experienced observer in the face of a gun, simply because she had been robbed before and knew what to look for," (2) "got across the highly inflammatory but non-probative information that the 17 year old female victim had been held up three times in one month," and (3) "implied, although the prosecutor professed ardently that this was not his purpose, intent, or effect, that appellant was possibly implicated in all of the mentioned robberies."

The rule against introducing evidence of other crimes (except for certain limited purposes) is designed to protect defendants from convictions founded on acts for which they are not on trial. The second question and answer, quoted above, obviated the danger that appellant would be connected with the prior robberies; the witness bluntly stated he was not.

Further the principle that irrelevant acts of third persons should be excluded from the trial (*res inter alios acta*) has no application here. While it has been said that proof of such collateral matters normally does not have relevance sufficient to outweigh its prejudicial effect, *State v. Lamb*, 468 S.W.2d 209, 211 (Mo.1971); *State v. Cox*, 360 S.W.2d 668, 671 (Mo.1962), in this case the focus of the line of questioning was Miss Edwards' increased awareness of what to note about a suspect's appearance, gained from prior experience and contact

with police. This represented highly relevant information in view of defense counsel's attack on her ability to remember the robber in his opening statement and on cross-examination. It was for the jury to decide whether it was "highly questionable" that Miss Edwards "was a cool and experienced observer in the face of a gun"; the testimony about her prior experience bore directly on that fact issue. And the witness' identity as a 17 year old female might have engendered sympathy, but it was also exploited by defense counsel in his attempt to undermine her identification testimony in the minds of the jury.

From this we find no error in the admission of the above testimony as the prior actions were expressly dissociated from appellant and the testimony was relevant to the central issue of the identification of appellant. The contention is denied.

### III.

For his third main point appellant decries the introduction of the gun in evidence claiming it was seized in violation of his rights under the fourth amendment to the U. S. Constitution and art. I, §§ 15 and 19 of the Missouri Constitution. He would invoke the exclusionary rule made applicable to the states in *Mapp v. Ohio*, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1960). It first should be noted that warrantless searches and seizures are presumptively invalid and that the State must justify such action on the basis of one of the "exceptions" to the requirement of a warrant. However, one such specific exception is controlling here. In *South Dakota v. Opperman*, 428 U.S. 364, 370 n. 5, 375, 96 S.Ct. 3092, 3097 n. 5, 49 L.Ed.2d 1000 (1976), the United States Supreme Court held that warrantless "police inventories of automobiles lawfully within governmental custody" are reasonable under the fourth amendment. The Court cited the authorities' needs to safeguard an owner's property while the auto remains in police custody, to protect against claims or disputes over lost or stolen property, and to guard against potential danger. *Id.* at 369, 96 S.Ct. 3092.

Fitting *Opperman* to our case requires that the lawfulness of police custody of the vehicle be demonstrated, which in turn begins with the legality of the stop and arrest. The information on which the University City police initially stopped Valentine's car was a detective's observation that the car had passed by, turned and again passed the same cleaning establishment several times at the same time of evening several earlier robberies had occurred, and it was because of the robbery problem in the neighborhood that several police cars were on "stake out." Under the principles of *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), this information was enough for an investigative stop. Once Valentine was stopped, the police needed no more than to see him as he alighted from his vehicle to establish probable cause for his arrest, because as Detective Mueller testified, he immediately noticed the resemblance of Valentine to one of the composite photos of wanted robbery suspects. Valentine's obviously fabricated story of where he was going buttressed the cause to arrest him. When they had validly arrested Valentine, the police reasonably acted to secure his car by making the decision to tow it from the street, and only after that decision was made did Mueller search it. Mueller testified at the suppression hearing that when a car is to be towed a search like this is standard police procedure in University City. These circumstances place this case within the holding in *Opperman*, and appellant's challenge under the United States and Missouri Constitutions must be rejected.

The judgment of the circuit court of St. Louis County is affirmed.

BARDGETT, C. J., MORGAN, J., and FINCH, Senior Judge, concur.

DONNELLY, J., dissents in separate dissenting opinion filed.

SEILER, J., dissents in separate dissenting opinion filed.

WELLIVER, J., not participating because not a member of the Court when cause was submitted.

DONNELLY, Judge, dissenting.

The principal opinion relies on *South Dakota v. Opperman*, 428 U.S. 364, 96 S.Ct. 3092, 49 L.Ed.2d 1000 (1976), to support its conclusion that the search of appellant's auto and seizure of the gun found hidden in the auto were not in violation of the Fourth Amendment to the United States Constitution. This reliance is misplaced.

A reading of *Opperman* and of *United States v. Chadwick*, 433 U.S. 1, 97 S.Ct. 2476, 53 L.Ed.2d 538 (1977) indicates to me that the inventory search exception to the Fourth Amendment warrant requirement created by five members of the Court in *Opperman* is limited to searches and seizures made in a "non-criminal context." *See Opperman*, 428 U.S. *supra* at 370, n.n. 5, 6, 96 S.Ct. 3097 at n.n. 5, 6 (opinion of Burger, C. J.), and at 382–383; 96 S.Ct. at 3103–3104 (Powell, J. concurring); *Chadwick*, 433 U.S. *supra* at 10, n. 5, 97 S.Ct. at 2483, n. 5. The search and seizure in the present case, by contrast, cannot be said to have occurred in a non-criminal context. *Opperman*, therefore, does not exempt the search and seizure which occurred in the present case from the warrant requirement of the Fourth Amendment.

We need not speculate whether the U. S. Supreme Court would exempt an inventory search *in a criminal context* from the warrant requirement of the Fourth Amendment. Appellant also challenges the search under Art. I, § 15 of the Missouri Constitution. This section provides:

"That the people shall be secure in their persons, papers, homes, and effects, from unreasonable searches and seizures; and no warrant to search any place, or seize any person or thing, shall issue without describing the place to be searched, or the person or thing to be seized, as nearly as may be; nor without probable cause, supported by written oath or affirmation."

As Justices Marshall, Brennan, Stewart, and White pointed out, in dissent in *Opperman*, "this Court's holding does not preclude a contrary resolution of this case or others involving the same issues under any applicable state law," *Opperman*, 428 U.S. *supra*

at 396, 96 S.Ct. at 3110; *see also North Carolina v. Butler*, —— U.S. ——, 99 S.Ct. 1755, 1759 n. 7, 60 L.Ed.2d 286 (1979). I would resolve the issue of "inventory searches" under Mo.Const. Art. I, § 15, in accordance with the views expressed by the dissenting opinion in *Opperman*. I would hold that no objects or information discovered in the course of a warrantless *inventory* search may be subsequently used in criminal proceedings unless the searchers had probable cause to believe that the vehicle or its contents represented a threat of physical harm.

The remedy in Missouri for illegal searches and seizures has long been exclusion of the evidence seized, *State v. Owens*, 302 Mo. 348, 357, 259 S.W. 100 (banc, 1924) (interpreting Art. II, § 11 Mo.Const. 1875; now Mo.Const. Art., I, § 15). The admission of the gun over defendant's objection was, therefore, error requiring reversal.

Accordingly, I respectfully dissent.

SEILER, Judge, dissenting.

I concur in the dissenting opinion of Judge Donnelly.

In addition, even if the interpretation given the *Opperman* case by the principal opinion is correct, the facts here do not fit. *Opperman* mentions three police needs that justify making an inventory of the contents of an automobile: the protection of the owner's property; the protection of the police from potential danger; and the protection of the police against claims or disputes that property has been lost or stolen while in police custody. Thus, in *Opperman*, the Supreme Court found that *on the record* before it, which showed that the search was indisputably conducted as a caretaking search of a car lawfully impounded for multiple parking violations, the owner was not present to make arrangements for its safety, the inventory was prompted by the presence of a number of valuables in plain view, and there was no claim that the inventory was a pretext covering an investigatory police motive, the search was reasonable. *Id.*, 428 U.S. at 375–76, 96 S.Ct. 3092.

In the case at bar, the police made no claim that the search was conducted for the safety of the officers. In fact, the transcript of the suppression hearing shows that the officer specifically disclaimed any fear for his safety, and that the defendant was safely in the custody of another officer at the time of the search. Thus, the search, to be valid, must have been conducted to protect the owner's property or to inventory it to protect the police from a claim that items were lost or stolen.

In this case, the officer testified that he simply searched the car prior to towing it because it was standard police procedure to do so. When asked by the prosecution: "Did you make an inventory of that car when you searched it of the things you found?", the officer answered "Not a written inventory, no", but that he had made "a report" about it. There is no evidence as to what was in the report.

An "inventory" is "a detailed list of articles of property; a list or schedule of property, containing a designation or description of each specific article; . . .," Black's Law Dictionary 959 (4th rev. ed. 1968). Nothing of this sort occurred here. Rummaging through the car of another cannot be justified simply on the basis that it is standard police procedure to do so. There is no showing that what the officer did was in an effort to protect the owner's property or to protect the police against false claims of loss. Therefore, we are upholding this warrantless search without requiring the state to justify its action as being within the exception relied on, even if there should be such an exception. If all it takes to support a search is a leading question from the prosecutor suggesting that the officer was making an inventory, the way is open for complete disregard of the Fourth Amendment with respect to automobile searches.