**STATE of Missouri, Respondent,**

v.

**Maurice PURNELL, Appellant.**

**No. 62019.**

Supreme Court of Missouri,
Division No. 1.

Sept. 8, 1981.

Rehearing Denied Oct. 13, 1981.

---

Doris Gregory Black, St. Louis, for appellant.

John C. Reed, Asst. Atty. Gen., Jefferson City, for respondent.

STOCKARD, Commissioner.

Appellant, Maurice Purnell, was found guilty by a jury of rape (for which he was sentenced to life imprisonment), robbery in the first degree (for which he was sentenced to life imprisonment), and of operating a motor vehicle without the consent of the owner (for which he was sentenced to imprisonment for five years, all terms to run consecutively). On this appeal appellant does not challenge the sufficiency of the evidence as to any of the charges. Therefore, we need not set forth the evidence in detail.

A jury reasonably could find from the evidence that about 6:15 o'clock in the morning of September 2, 1978, while the prosecutrix was driving to work and was stopped for a traffic light, appellant entered her automobile, robbed her of all the money she had in her purse, repeatedly hit and struck her, threatened to kill everyone in her family if she did not cooperate and to injure her seriously if she looked at him, and then after driving to another location he raped her. He then had a bowel move-

ment and rubbed some of the feces on her and her clothing.

Appellant's first point is that the trial court "abused its discretion" in excluding "material parts of appellant's expert psychiatrist's testimony that would have indicated that because of the bizarre manner in which the assailant conducted himself during the course of the rape, i. e. smearing [his own] feces on [the] victim and in her panty hose, said assailant definitely exhibited a psychotic breakdown and was psychotic." Appellant asserts that such evidence was "probative and relevant" because when the qualified psychiatrist previously examined appellant he found him "not psychotic."

Prior to trial the public defender's office filed a motion for a mental examination of appellant, and such examination was conducted by Dr. Sadashir Parwatikar, an employee of the Department of Mental Health who was a consultant for forensic psychiatry. As the result of that examination the doctor concluded that appellant was not suffering from a mental disease or defect within the meaning of Chapter 552 RSMo 1978; that he understood the charges against him and was competent to assist his attorney in his defense; that he appreciated the nature, quality, and wrongfulness of the alleged offense; and that he was capable of conforming his conduct to the requirements of the law. In his report filed with the court, under the sub-heading "Discussion," the doctor stated: "Actions of defecating and smearing feces over the victim's clothes along with stuffing pants in his trousers is indicative of serious psychotic breakdown. However, there is no evidence of any psychotic breakdown in the life of Mr. Purnell." The only information had by the doctor of this conduct at the time he made his report was obtained by reading the police report, which was not introduced in evidence.

After the State closed its case and appellant's counsel had made an opening statement, Dr. Parwatikar was called as a witness, presumably by appellant but the direct examination was by the State. He testified out of the presence of the jury that he had made an examination of appellant and had filed his report with the court, but that in doing so he had not interviewed the prosecutrix or any witness. On cross-examination he testified as to his qualifications, and that over the previous five years he had made "about five hundred evaluations." The court stated that it understood what appellant's counsel proposed to do with the doctor, but suggested that she "make a record." Counsel then stated she wanted to call the doctor to testify (after certain basic conditions were met) "what his conclusions were based upon any degree of medical certainty as to the type of behavior that was committed in this particular instance." The prosecutor objected because the doctor was "not an expert in rape," was not present when the rape occurred, has not interviewed the witnesses, and, as stated by the prosecutor, "I believe it is negative evidence."

The court ruled that not "enough foundation has been laid at this time to admit this testimony," but it gave no indication of what it considered to be missing, and then ruled that "more importantly, * * * there is no issue raised as to [appellant's] sanity in this lawsuit," and "the question before this jury is whether or not he is the man who committed this crime, and to allow an expert witness to testify to a conclusion based upon an initial police report * * * invades the province of the jury to make a determination, and for those reasons I am going to sustain the State's objection." Appellant then asked if the court was ruling that Dr. Parwatikar could not testify at all, and the court replied that he could testify "but as to a question of whether this defendant is guilty of this crime because the person who committed it, based on that report, is psychotic, I would sustain the State's objection to that." Appellant's counsel then commented that she had not asked the doctor, and he had not indicated that he would say that appellant did not commit the offense, but he "can only say [that] when he observed [appellant, he] did not exhibit any psychotic traits * * *." Appellant's counsel then made what she termed an "offer of proof" that Dr. Parwatikar would testify

(1) that he examined appellant; (2) that he was aware of the statements in the police report and that in at least 500 examinations the use of the police report was the way he determined the facts of a crime; (3) that the police report showed that the robbery and rape occurred and that feces was spread over the prosecutrix; (4) that such behavior was "psychotic behavior on the part of the person who was perpetrating it;" and (5) that in June of 1979 he examined appellant and found him not to be psychotic and had no history of psychotic behavior.

Dr. Parwatikar was then called as a witness by appellant. He testified before the jury as to his qualifications and that he had examined appellant with the result shown in his report. He was then asked this hypothetical question:

"If you will, assume, and I pose it hypothetically, that on a certain date in 1978 a woman is driving her car and is stopped at a red light; assume further that a subject who this woman does not know opens her car door without her consent, forces her into the car and drives her car against her will, okay. Assume further this subject drives this woman to another location in an area that she is not aware of, where the car is parked; that the subject forces this woman to walk down a hill and into a certain wooded area, and that a sexual act is committed upon this woman. Assume further that the person who commits this act has a bowel movement, either during or after that act, and smears that movement upon this young woman, all right. Assume all those facts, Dr. Parwatikar, and I would like you to indicate whether or not you have, or can you state with any degree of medical certainty whether or not the individual who performed or committed this act had a mental disease or mental illness."

The State's objection, which was sustained, was that the question calls "for a conclusion not based on what this particular witness can testify to."

■ We experience considerable difficulty in reducing this contention to a review-able status. At no time during the discussion between counsel and the court did appellant state the purpose of the proposed testimony. In his brief to this court he states for the first time that "it goes to the identity of the assailant," citing *State v. Terry*, 582 S.W.2d 337 (Mo.App.1979), which we consider to be contrary to his contention. We can surmise that perhaps appellant wanted to use this testimony as the basis to argue that he could not have been the assailant because the assailant was psychotic and he was not. However, if so, that reason was never communicated to the court. In fact, the discussion between counsel and the court indicates that the purpose was to show appellant was psychotic, and it is evident that the court had that impression. Since appellant did not enter a plea of not guilty by reason of "mental disease or defect" such evidence was not admissible for that purpose. Section 552.-020.1 RSMo 1978.

■ Generally speaking the admission or rejection of expert testimony such as we have here is a matter resting in the discretion of the trial judge. *State v. Pinkus*, 550 S.W.2d 829, 840 (Mo.App.1977). In view of what we consider to be inadequate presentment of the purpose of the interrogation, and the understandable position taken by the trial court, we cannot hold as a matter of law that the court abused its discretion in sustaining an objection to the hypothetical question.

By his second point appellant asserts prejudicial error resulted when the trial court overruled his objection to the "testimony of State's expert [witness] Paul English" because it related to an exhibit which had not been disclosed to appellant, and because the failure to disclose the exhibit "impeded [appellant] in trial preparations."

At the time appellant was arrested impressions of his fingerprints were taken and placed on what is referred to as an identification card which was later used to identify a latent print found on the automobile of the prosecutrix as being a print of the left index finger of appellant. Prior to trial

appellant requested the State to disclose any "reports or statements of experts * * * including results * * * of scientific tests, experiments, or comparisons." In response, the State furnished appellant the report of its expert witness, Paul English, in which he stated that the latent fingerprint which was taken from the automobile had been identified as an impression of the left index finger of appellant. After receiving this report appellant's counsel talked to Paul English, and he told her that the points of identification were at least eight in number.

We note here that appellant does not contend that he was not timely furnished everything he requested or wanted concerning the latent fingerprints found on the automobile.

When Paul English was called to testify, appellant's counsel objected because, as she said, the State was attempting to introduce the identification card containing appellant's fingerprints in evidence and appellant "has not been given a copy of that particular exhibit."

■ This point is without merit. In appellant's request for discovery he asked to be furnished "*reports* or statements of experts * * * including *results* * * * of scientific * * * *comparisons.*" (Italics added.) The *report* of Paul English, the State's expert witness, containing the *result* of the *comparison* made by him of the known print of appellant with a print found on the automobile of the prosecutrix was precisely what was requested and what was timely furnished to appellant in advance of trial. There was no request which directly or indirectly called for all "exhibits" the State intended to offer in evidence. For example, see *State v. Davis,* 556 S.W.2d 45 (Mo. banc 1977). Appellant was informed by the report furnished to him, and also as the result of the conversation between Paul English and appellant's counsel, that a comparison of the latent print had been made with a known print of appellant's index finger. If appellant believed that failure to turn over to him the identification card containing the known print was not in full compliance with the request for discovery,

it was his responsibility to call that failure to the court's attention and request appropriate orders pursuant to Rule 25.16 (formerly Rule 25.45). That he did not do. Also, appellant's fingerprints were not in the exclusive control of the State and for that reason not available to appellant. If he wanted a set of his own fingerprints, he could have had them made. There was no suppression of evidence in the sense that the State had possession of material evidence which appellant did not know about and was not told of its existence. We agree with the trial court when it ruled that counsel for the State had complied in good faith with the discovery request.

■ Assuming arguendo that the State should have given appellant the identification card pursuant to the request made, Rule 25.16 grants to the trial court several courses of action, and what remedial action should be taken is a matter for the exercise of discretion. *State v. Royal,* 610 S.W.2d 946 (Mo. banc 1981). One such remedial action is to "order such party to make disclosure of material and information not previously disclosed," Rule 25.16. A recess was declared immediately following the above ruling pertaining to compliance. The purpose of the recess is not shown, but the record shows that the identification card was then available in the courtroom, and there is nothing to indicate that appellant was not then permitted to view and inspect the card if he desired to do so, and there was no request for additional time to do so. The purpose of the rules pertaining to discovery is not to require the prosecuting attorney to "spoonfeed" appellant's counsel with every possible item of information. We find no abuse of discretion in admitting the identification card into evidence and permitting the witness to use it in his testimony concerning the comparison of the latent print with the known print.

By his third point appellant asserts the trial court abused its discretion in not declaring a mistrial after the prosecutrix "made inflammatory prejudicial statements to the circuit attorney concerning her testimony, which statements indicated that the

[prosecutrix] was not told by [him] that she would 'have to go through this' (referring to cross-examination), in that said statements tended to inflame the jury and cause undue sympathy for the witness."

During cross-examination of the prosecutrix she became upset and annoyed when asked questions about her present weight and what she weighed at the time of the offense. The court suggested to counsel that they approach the bench. The prosecutrix announced that she had to go to the bathroom and left the courtroom. The court then declared a "short recess." The next thing shown by the record is that the cross-examination of the prosecutrix continued. There then followed the examination of three other witnesses as shown in thirty-five pages of transcript, and then adjournment of court for that day. The following morning appellant moved for a mistrial because, as stated by appellant's counsel, on the previous day prosecutrix was "talking in the presence of the jury and outside the hearing of the judge, myself and Mr. Warzycki [prosecutor] and was making certain statements in the presence of the jury that I believe were prejudicial. She was talking and saying at that time she was not going to go through this, she was not going to say anything else, and was going to leave, directing [her] comments either to the jury or to a person I found out was her husband seated in the first row behind the attorneys' section in the courtroom." Counsel further stated that the prosecutrix stated to Mr. Warzycki, " 'Joe, you didn't tell me that I had to go through all this,' or words to that effect, and stormed out of the courtroom in the backway. She was followed by two people [her husband and a lady member of 'a sex crime team'] * * * and both of these individuals hurriedly rushed after her. Neither of them made any statements I am aware of during the time they left."

We note that appellant's counsel was not completely correct when she advised the court that whatever the prosecutrix said was "outside" her hearing, because she also stated, "I wasn't sure exactly what she [prosecutrix] had said, but I do recall her making the statement that she wasn't going to say anything else." Also, the comments of the prosecutrix were not "outside" the hearing of the trial judge because when this matter was brought up the following morning he stated that his recollection of "what happened last night is substantially what you recall," and while he did not know "exactly what [the prosecutrix] did say, * * * it was to the effect as you [appellant's counsel] have quoted it." The court then observed that there was no "general disorder or a melee in the courtroom," and "it wasn't particularly significant and it was not a shouting match or anything of that nature."

■ We find no reversible error in this situation for two reasons. In order to preserve such an incident as this for appellate review, there must be a timely and proper objection. *State v. Simmons*, 500 S.W.2d 325 (Mo.App.1973); *State v. Rideeoutte*, 572 S.W.2d 877 (Mo.App.1978). Appellant was aware of the conduct of the prosecutrix but apparently then considered it to be of insufficient importance to request any relief. At the time of the incident the trial court might have considered that some action by it other than a mistrial would have been appropriate, but appellant waited until the following morning, and he then requested no relief except the drastic remedy of a mistrial. This indicates, at least to us, that appellant was more interested in obtaining a circumstance to complain about on appeal than preventing any adverse reaction by the jury as a result of the incident.

■ Also, the trial court observed the incident and determined it not to have been "particularly significant." It has long been the rule that the granting of a mistrial rests largely in the discretion of the trial court, and the appellate court determines only whether the trial court abused its discretion. *State v. Hepperman*, 349 Mo. 681, 162 S.W.2d 878 (1942); *State v. Jackson*, 506 S.W.2d 424 (Mo.1974). It cannot be said as a matter of law that in the circumstances of this case the trial court abused its discretion in refusing to declare a mistrial when finally requested.

Appellant's fourth point is that the trial court erred in refusing "to suppress evidence and identification" because (1) "the police had no probable cause to arrest or stop and detain appellant who had committed no offense in the presence of the arresting officers and who was engaged in lawful activities," and also because (2) "the lineup * * * was prejudicially suggestive where appellant had participated in other lineups concerning rape charges in which appellant was always placed in the number one position wearing the same clothing, and where appellant was the only participant of the size and height similar to the description given by the alleged rape victims," and (3) because the police failed to advise appellant of his *Miranda* rights and failed to advise him that he was a suspect in the rape, robbery and operating charges for which appellant was arrested.

In the argument portion of appellant's brief under this point, no reference is made to the issue of the lineup, but it is the subject of the following point in his brief. Also, in argument reference is made only to the fingerprint identification card, which was the subject of the issue in appellant's second point, and to a photograph of appellant which was taken immediately after appellant was arrested on September 8, 1978. These apparently are the only items appellant contends should have been suppressed.

Appellant urges that there was no probable cause for the investigatory stop and the arrest of appellant.

■ "Where police officers entertain a *reasonable suspicion* that criminal activity may be afoot, they may stop the suspected person, identify themselves as police officers, require the suspect to identify himself, and make reasonable inquiries concerning his activities." *State v. Lasley*, 583 S.W.2d 511 (Mo.banc 1979). See also *Adams v. Williams*, 407 U.S. 143, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972); *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). The "reasonable suspicion" that entitles an officer to stop an individual exists when the officer is "able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Terry v. Ohio*, supra, 392 U.S. at 21, and 88 S.Ct at 1880.

■ Applying these principles to the facts of this case, we are constrained to hold that the police officers had "reasonable suspicion" to stop appellant. At 2:00 o'clock in the morning of September 8, 1978, when every store or place of business in the area was closed, police officers Ronald Jackson and Robert Baker, who were in uniform and on regular patrol duty, saw appellant walking in the intersection and "looking into businesses," one in particular being a Standard Service Station. This was an area in which there had been "numerous amount of crime." Appellant was on foot, there was no automobile present in which he could have used to arrive there, and there was no apparent reason for his presence in that area at that time in the morning. As the officers approached in their marked car, appellant began to hurriedly walk southward on Goodfellow away from the service station.

The officers stopped appellant, identified themselves (which was obvious because they were in uniform and in a marked car) and asked appellant for identification. He stated he had none. He was then asked what he was doing in the area, and he stated he was waiting for a woman. He also stated that he had parked his car about two blocks away and had walked to the area. It was then that the officers observed that appellant matched a composite drawing, which they had in their police car and which had been prepared with the help of the prosecutrix in this case, of a person wanted for rape, robbery, and abduction. It was then, and because of the striking resemblance of appellant to the composite drawing, that the officers arrested appellant and took him to the police station.

■ The police officers were assigned to patrol duty to protect the lives of person and property in the area. Upon seeing appellant at the intersection under

the circumstances related above the officers would have been derelict in their duty not to have made some investigation, and the reasonable method of carrying out their duties was to stop appellant and ask him why he was in that neighborhood at that most unlikely hour. The police were aware of "specific articulable facts" that, together with rational inferences drawn therefrom would have led any reasonable peace officer to suspect that some criminal activity was afoot. The "reasonable suspicion" which is needed to justify an investigative stop need not rise to the level of probable cause to arrest, and it is not necessary that the articulable facts and rational inferences exclude every possible interpretation other than criminal activity. *State v. Lasley*, supra, at p. 518. The governmental interest in effective crime prevention and detention "underlies the recognition that a police officer may in appropriate circumstances and in an appropriate manner approach a person for purpose of investigating possible criminal behavior even though there is no probable cause to make an arrest." *Terry v. Ohio*, supra, 392 U.S. at p. 22, 88 S.Ct. at p. 1880. The standard is whether the facts available to the officers at the moment of the stopping for investigation warrant a person of reasonable caution in having the belief that the action taken was appropriate. *State v. Lasley*, supra, at p. 518. The standard clearly was met in this case.

We now turn to the issue of probable cause for the arrest. As we have determined above, before the arrest took place appellant had been properly stopped for investigation purposes. In these circumstances the officers had the opportunity to observe appellant's features and his appearance. It was not until after this authorized and proper observation occurred that the officers recognized the close resemblance of the person they had stopped with the composite drawing of the person wanted by the police for the crimes of rape, robbery, and abduction. It was not until then that appellant was placed under arrest and given his *Miranda* rights and taken to the police station. The basic question presented is whether a police officer has reasonable cause to arrest a person when the officer observes a close resemblance to a composite drawing of a person who is wanted for a crime.

Probable cause to make a warrantless arrest exists when the facts and circumstances within the arresting officers' knowledge and of which they had reasonably trustworthy information are sufficient in themselves to warrant a person of reasonable caution in the belief that an offense has been or is being committed by the person to be arrested. *State v. Johnson*, 463 S.W.2d 785 (Mo.1971); *State v. Robinson*, 484 S.W.2d 186 (Mo.1972); *State v. Goodman*, 608 S.W.2d 498 (Mo.App.1980). This must be determined from the particular facts of each case. *State v. Seymour*, 438 S.W.2d 161 (Mo.1969); *State v. Goodman*, 449 S.W.2d 656 (Mo.1970). The use of a photograph has frequently been held to be proper in determining probable cause. See *U.S. v. Hayes*, 553 F.2d 824 (2d Cir. 1977), cert. den. 434 U.S. 867, 98 S.Ct. 204, 54 L.Ed.2d 143 (1977); *Commonwealth v. Boswell*, 374 Mass. 263, 372 N.E.2d 237 (Mass. 1978); *People v. Richmond*, 84 Ill.App.3d 1017, 40 Ill.Dec. 434, 406 N.E.2d 135 (1980). A composite drawing is but another method of showing the appearance of a person, and the use of a composite sketch or drawing in determining probable cause to arrest has been expressly approved. See for example *Davis v. United States*, 367 A.2d 1254 (D.C. App.1976), where in Footnote No. 26 it was noted: "The sketches are based on information communicated directly to the artist by the victims, and the likenesses are criticized and approved by the victims before use. This method of identifying suspects is apparently well accepted in this jurisdiction." Cited were the cases of *Adams v. United States*, 302 A.2d 232 (D.C.App.1973); *United States v. Poole*, 495 F.2d 115 (D.C.App. 1973), cert. den. 422 U.S. 1048, 95 S.Ct. 2667, 45 L.Ed.2d 701 (1975).

In *State v. Valentine*, 584 S.W.2d 92, 98 (Mo.banc 1979), the police were authorized to stop the defendant's automobile for investigation. This court stated: "Once Valentine was stopped, the police needed no

more than to see him as he alighted from his vehicle to establish probable cause for his arrest, because as [the arresting officer] testified, he immediately noticed the resemblance of Valentine to one of the composite photos of wanted robbery suspects." The accuracy of the composite drawing which would bear on the reasonableness of its use can be tested by a motion to suppress, and that was done in this case.

■ The trial court expressly held that in the total circumstances of this case the composite drawing constituted probable cause for the warrantless arrest of appellant. That determination is clearly supported by the evidence.

Appellant's fifth and last point is that the court erred in overruling his motion to suppress identification because (1) "the victim did not have a basis for identifying the defendant in that there was no opportunity for the victim to observe her assailant," and because (2) "the pretrial identification procedures were so impermissibly suggestive as to give rise to a substantial likelihood of irreparable misidentification and thereby tainted the in-court identification." Appellant asserts that (a) he "was the shortest participant whose appearance was more like that of the person in the composite drawing," and (b) where his "position in previous lineups was always the same, and where victims of other rapes may have had an opportunity to converse concerning previous identifications of defendant."

Prior to trial appellant filed a motion to suppress the identification testimony of the prosecutrix. After a hearing the trial court expressly ruled that the lineup identification was "basically fair" and overruled the motion to suppress. Thereafter, at the trial, without objection, the prosecutrix identified the composite drawing as resembling the person who had raped her, and she identified a photograph of the lineup she had viewed and testified that she had identified appellant as one of the persons in that lineup. She then without objection pointed out and positively identified appel-

lant as the person who robbed and raped her.

■ It is the well established rule that even though the issue of permissible identification was presented in a motion to suppress, the failure of appellant to object to the in-court identification when made results in the issue of identification not being preserved for appellate review. *State v. Nauman*, 592 S.W.2d 258 (Mo.App.1979); *State v. Johnson*, 574 S.W.2d 42 (Mo.App. 1978); *State v. Brownridge*, 459 S.W.2d 317 (Mo.1970); *State v. Berry*, 609 S.W.2d 948 (Mo. banc 1980); *State v. Valentine*, supra; *State v. Daniels*, 487 S.W.2d 465 (Mo.1972); *State v. Ethelbert*, 611 S.W.2d 379 (Mo.App. 1981); *State v. Perry*, 592 S.W.2d 307 (Mo. App.1979). Although appellant does not so request, because of the seriousness of the offenses we shall in a most liberal exercise of judicial discretion review the contentions presented to determine if there occurred plain error.

■ Appellant's contention that the victim did not have "a basis for identifying * * [because] there was no opportunity for the victim to observe her assailant," is totally without merit. It is difficult to visualize a situation in which a victim would have a better opportunity to observe the features of an unmasked assailant than during the commission of a rape. It is true that appellant warned the prosecutrix not to look at him or he would "cut [her] eyeballs out," [1] and that the prosecutrix testified that as a result she did not look at him, but she added that she did not do so because "I already had my look at him." She also testified that she "got a couple of sneak looks up on the hill," which was where the rape occurred. She elaborated that "I took peeks, and every time I took a peek he knocked me hard. I will never forget his face." In addition when appellant first opened the car door he was then in full view of the prosecutrix, and as she testified, "I stepped out and looked at him straight in the face." The mere fact that the period of time dur-

---

1. The case of *State v. Brooks*, 513 S.W.2d 168 (Mo.App.1973) received substantial publicity, and this threat suggests that appellant was aware of that publicity.

ing which the prosecutrix viewed her assailant may have been short does not mean it was insufficient for her to base her identification. *State v. Nauman, supra.*

In support of appellant's contention, that the pre-trial identification procedures were impermissibly suggestive, he relies on the asserted facts that appellant was the "shortest lineup participant in the two lineups that were conducted," that he was positioned the "first person to the left," and that after the first lineup was viewed by others who identified appellant in relation to other rapes involving other victims, "the viewers had an opportunity to talk with [the prosecutrix] who subsequently viewed a lineup in which appellant was again placed in the same position."

 The prosecutrix viewed only one lineup in which she identified appellant. She had previously viewed another lineup in which appellant was not present, but she did not identify anyone. A colored photograph of the lineup in which appellant was present is before this Court and has been viewed. Three of the six persons, one of whom is appellant, are shown to be almost the same height. They are so nearly the same height that no individual can be as much as an inch taller than the others. A fourth may be an inch taller than the three, and the remaining two may be two inches taller than the first three. All are substantially of the same complexion. The photograph disproves the contentions of appellant concerning the lineup. Appellant's contention, as he states in his argument, that the others who viewed the lineup "had an opportunity to talk" with the prosecutrix is contrary to the record. She testified that she did not talk to others who viewed a lineup containing appellant, that "We weren't together," and that she did not see anyone else who was viewing a lineup containing appellant. It was immaterial where appellant was positioned in lineups which were not viewed by prosecutrix and about which she received no information.

We find no merit to appellant's challenges to the identification procedures,

much less than plain error occurred within the meaning of Rule 29.12(b).

The judgment is affirmed.

PER CURIAM:

The foregoing opinion by STOCKARD, C., is adopted as the opinion of the court.

MORGAN, P. J., DONNELLY, C. J., and RENDLEN, J., concur.

BARDGETT, J., not participating.