**STATE of Missouri, Respondent,**

v.

**John David FAIN, Appellant.**

No. 13300.

Missouri Court of Appeals,
Southern District,
Division Two.

Sept. 27, 1984.

Motion for Rehearing or Transfer
Denied Oct. 19, 1984.

David Robards, Joplin, for appellant.

John Ashcroft, Atty. Gen., Frank A. Rubin, Asst. Atty. Gen., Jefferson City, for respondent.

CROW, Judge.

Appellant ("Fain"), tried by the court without a jury, was found guilty of the class C felonies of burglary in the second degree, § 569.170, RSMo 1978, and stealing property of the value of at least $150, § 570.030, RSMo 1978, as amended by Laws 1981, pp. 638–39. Sentenced as a persistent offender, § 558.016, RSMo 1978, as amended by Laws 1981, p. 636, he received concurrent terms of eight years' imprisonment. His sole contention on appeal is that items seized from him at or after his arrest should have been excluded from evidence because the arresting officers lacked probable cause to believe he had committed either offense.

Fain filed a pretrial motion to suppress those items. The trial court, after an evidentiary hearing, denied the motion. There are no issues of fact.

On Sunday evening, January 23, 1983, Gwendolyn Sue Neff ("Gwen"), who lived alone in a house on highway 71 Alternate, 7 miles northeast of Neosho, returned from church and discovered that her home had been "broken into" while she was gone. Numerous items were missing, including her 1972 Neosho High School class ring with her initials engraved inside, and a silver ring with black engraving that belonged to her ex-husband. Also missing were a brown "tote bag," a sweat shirt with "Goodman Pirates" across the front, a brown poplin shirt bearing a Marine insignia, a pair of black Marine boots, a gray and blue T-shirt with "Nike" across the front, and some rolls of pennies.[1]

Gwen saw no one around her house, but she did discover footprints in the snow.

Charles Robert Barnett of the Newton County sheriff's office investigated the incident, noting that the footprints indicated the intruder was a hitchhiker, and that he had acted alone. Barnett explained, "You could see where he walked in off the highway through the snow, then he walked away from the house and down behind it into the woods, down through a hollow and then back out through the creek bottom for approximately two miles, then back onto 71 highway." Barnett inferred from the size of the footprints that the culprit was a male.

Barnett was told by Grace Schmidt, who resided about one-eighth of a mile south of Gwen, that she (Grace) had driven by a hitchhiker on highway 71 Alternate at Elwood Junction about 9 o'clock that night. Elwood Junction is "probably two and a half miles" south of Gwen's home. The hitchhiker was carrying a bag.

1. Many other articles were gone. There was uncontradicted evidence that the aggregate value of all missing items exceeded $150.

Barnett received no information about anyone else being within a 3-mile radius of Gwen's home that date.

The next morning (January 24), Gwen phoned a friend, Deborah Allmon, telling her of the break-in. Gwen reported to Deborah that the brown tote bag was missing. Deborah owned a similar bag, of a different color. She and Gwen had purchased their bags together, at the same store.

Between 1:00 and 1:30 p.m. that day (January 24) Deborah, accompanied by Irene Medlin, saw a man walking on the "boulevard" in Neosho. The man was carrying a brown tote bag, which, to Deborah, appeared identical to Gwen's.

Irene Medlin phoned the sheriff's office, telling Barnett about the man with the tote bag. She advised Barnett that the man was entering the "Seven-Eleven store."

Barnett, accompanied by another officer, drove to the store, arriving within 5 minutes. They saw Fain on the Seven-Eleven parking lot, just starting across the street. Barnett recalled, "He was carrying this bag[2] right here along with his knapsack that he puts over. He had on a blue parka."

Barnett drove onto the parking lot and "hollered" at Fain to "come back over." Fain complied. Barnett identified himself and asked Fain who he was and where he was going. Fain gave Barnett a name and said he was going to Little Rock, Arkansas.

Barnett then "patted him down for weapons" and felt a bulge in a pocket. Barnett asked Fain if he had any weapon on him, and Fain replied he did not. Barnett then reached into Fain's pocket and pulled out "rolls of pennies."

Barnett was aware that several rolls of pennies had been taken from Gwen's house. Additionally, it appeared to Barnett that Fain had no vehicle at the Seven-Eleven store. Barnett explained, "He was carrying his bag and everything and I believed him to be a hitchhiker."

Barnett thereupon arrested Fain for the burglary of Gwen's house. Fain was taken to the sheriff's office, booked and fingerprinted.

Gwen was called to the sheriff's office, arriving around 3:00 p.m. She saw Fain there, and noticed he was wearing a "Goodman Pirates" sweat shirt. Over it, Fain was wearing a "Marine shirt." Gwen identified both shirts as items stolen from her home, conceding, however, that neither bore her name. Fain was also wearing black boots identical to those stolen from Gwen's house.

Gwen was shown her class ring, engraved with her initials, and her ex-husband's silver ring with black engraving. She identified both rings. She also saw a gray and blue "Nike" T-shirt, a brown tote bag and rolls of pennies. All of those items appeared to be hers, albeit none had any identifying mark.

Though not explicit in the record, it is fairly inferable that all the items shown Gwen at the sheriff's office were found in Fain's possession. Fain's motion to suppress is based on that premise. We therefore proceed on that assumption.

Fain, relying on U.S. Const. amends. IV and XIV, and Mo. Const. art. I, § 10, asserts that his right to be secure against unreasonable seizure of his person was violated when Barnett called him to the officers' vehicle in the parking lot at the Seven-Eleven store. This "show of authority," says Fain, was enough to make a reasonable person believe he was not free to leave. Fain insists that the facts and circumstances known to Barnett, or of which he had reasonably trustworthy information, were not sufficient to warrant a person of reasonable caution to believe that Fain had burglarized Gwen's house. Consequently, argues Fain, his arrest was without probable cause and the evidence seized from him should have been suppressed.

Several Missouri cases have considered the circumstances under which a law en-

---

**2.** Evidently, the brown tote bag.

forcement officer may constitutionally detain and question a person in a public place.

In *State v. Rayford*, 646 S.W.2d 137 (Mo. App.1983), police were called to the scene of a store burglary around 5:00 a.m., and found a plexi-glass portion of the front door lying inside. A sole print from a tennis shoe was on the plexi-glass. Soon thereafter, an officer saw two men, two blocks from the store, walking away from the area. They seemed startled and one made a motion as though he were getting rid of something. The officer stopped them about 150 feet from where he had first seen them, asking their identity and their purpose for being on the street. They identified themselves and said they were jogging. The officer noted, however, that they were not breathing heavily, and that one, Rayford, was wearing tennis shoes. A hand scale, similar to one missing from the store, was quickly found in the area where the officer had first seen the men. At that point, they were placed under arrest. Later, an expert determined that the print on the plexi-glass was made by Rayford's right tennis shoe.

Rayford, arguing that the shoe was taken after an unlawful arrest, asserted that the arrest occurred when the officer ordered him to approach the patrol car, and that the officer, at that instant, had no probable cause for arrest.

The court, holding that no arrest occurred at that point, said: "When police officers entertain a reasonable suspicion that criminal activity may be afoot, they may stop a person upon suspicion, require the suspect to identify himself and make reasonable inquiries concerning his activities. 'Reasonable suspicion' need not rise to the level of probable cause to arrest." *Id.* at 140[4]. The shoe was held admissible.

In *State v. Greenhaw*, 553 S.W.2d 318 (Mo.App.1977), an officer saw four individuals, apparently in their mid-teens, walking along a roadway. As it was a school day, the officer believed they were truants, so he asked them for identification. He then learned, by radio, of an outstanding arrest

warrant for one, Greenhaw. The officer thereupon arrested Greenhaw, and a search of his billfold produced a note eventually used as evidence to convict him of murder.

Greenhaw argued that the officer had no probable cause to stop him, consequently the detention was a seizure of his person in violation of the Fourth Amendment, which contaminated the evidence obtained in his subsequent arrest.

Rejecting that contention, the court found that the officer's momentary detention of the quartet for identification was reasonable under the circumstances, and did no violence to Greenhaw's constitutional rights. *Id.* at 323[5]. The officer's request for identity was not a seizure of Greenhaw's person in violation of the Fourth Amendment. *Id.* at 324.

The Supreme Court of Missouri dealt with the subject in *State v. Purnell*, 621 S.W.2d 277 (Mo.1981). Two officers, patrolling a high crime area at 2:00 a.m., saw Purnell on foot "looking into businesses," which were closed. As they approached in their patrol car, Purnell hurriedly walked away. The officers stopped him and asked for identification. When Purnell responded that he had none, he was asked what he was doing. He replied that he was awaiting a woman. The officers then observed that Purnell matched a composite drawing of a suspect wanted for rape, robbery and abduction. Purnell was thereupon arrested. He was later convicted of the rape and robbery, being identified as the perpetrator by the victim of those crimes.

He contended that his identification should have been suppressed because the officers had no probable cause to detain him, as he had committed no offense in their presence.

█ The court disagreed, holding that where police officers entertain a reasonable suspicion that criminal activity may be afoot, they may stop the suspected person, identify themselves as police officers, require the suspect to identify himself, and make reasonable inquiries concerning his activities. *Id.* at 284[9]. Reasonable suspi-

cion that entitles an officer to stop an individual exists when the officer is able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant the intrusion. *Id.; Terry v. Ohio,* 392 U.S.1, 21, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). The standard is whether the facts available to the officer at the moment of the stopping for investigation warrant a person of reasonable caution in having the belief that the action was appropriate. *Purnell,* 621 S.W.2d at 285.

Other cases reach similar results. *State v. Lowrance,* 619 S.W.2d 354 (Mo.App. 1981); *State v. Clark,* 607 S.W.2d 817 (Mo. App.1980); *State v. Battle,* 588 S.W.2d 65 (Mo.App.1979).

■ Based on the cases cited, we hold that Barnett did not offend Fain's constitutional right against unreasonable seizure of his person by calling Fain to the patrol car and asking him who he was and where he was going.

Barnett, when he made that inquiry, possessed the following information: (1) Gwen's home had been burglarized the preceding evening, and a brown tote bag was one of the items taken, (2) footprints in the snow indicated the burglar was a male hitchhiker, acting alone, (3) the tracks led from highway 71 Alternate to Gwen's home, then, by a circuitous route, back to the highway, (4) a lone hitchhiker carrying a bag had been seen on highway 71 Alternate about 9 o'clock on the night of the burglary, 2½ miles south of Gwen's home, (5) no report had been received of anyone else being within a 3-mile radius of Gwen's home on the night of the burglary, (6) between 1:00 and 1:30 on the afternoon following the burglary, Fain was seen in Neosho, on foot, 7 miles south of Gwen's home, carrying a tote bag identified by Deborah Allmon as being identical to Gwen's.

Barnett spotted Fain a few minutes after he had been observed by Deborah, and saw that Fain was carrying the tote bag and a knapsack, and that Fain apparently had no motor vehicle, inasmuch as he had crossed the Seven-Eleven parking lot and was starting to cross the street. Barnett could reasonably infer from those observations—which he did—that Fain was a hitchhiker.

We hold that the specific and articulable facts known to Barnett, together with rational inferences therefrom, reasonably warranted his inquiry about Fain's name and his destination. *Purnell,* 621 S.W.2d at 284[9]. Those facts were sufficient to warrant a person of reasonable caution in having the belief that the action taken was appropriate. *Id.* at 285.

Upon learning that Fain's destination was Little Rock, Arkansas, a city south of Neosho, Barnett could reasonably assume that Fain had come from the north, the direction of Gwen's house.

■ Adding that to what he already knew, Barnett, at that point, had probable cause to arrest Fain. Probable cause to arrest without a warrant simply means a knowledge of facts and circumstances sufficient for a prudent person to believe a suspect is committing or has committed an offense. *State v. Heitman,* 589 S.W.2d 249, 253[4] (Mo. banc 1979), *cert. denied,* 446 U.S. 941, 100 S.Ct. 2164, 64 L.Ed.2d 795 (1980); *State v. Salkil,* 649 S.W.2d 509, 514[2] (Mo.App.1983), *cert. denied,* —— U.S. ——, 104 S.Ct. 530, 78 L.Ed.2d 712 (1983). Its existence must be determined by practical considerations of everyday life on which reasonable persons act, and not on the hindsight of legal technicians. *Salkil,* 649 S.W.2d at 514[2]; *State v. Goodman,* 608 S.W.2d 498, 500[1] (Mo.App.1980). The facts and circumstances known to Barnett were sufficient for a prudent person to believe Fain was the individual who had burglarized Gwen's house the preceding evening. That being so, Fain's complaint about the "pat down," during which the rolls of pennies were discovered, is unavailing. A search of a person conducted incident to his lawful arrest does not violate the Fourth Amendment. *Heitman,* 589 S.W.2d at 253[3]. As there was probable cause for Fain's arrest *before* the "pat down," it is immaterial whether the frisk

was independently justifiable under *Terry*, 392 U.S. 1, 88 S.Ct. 1868.

The trial court ruled correctly in denying Fain's motion to suppress.

The evidence is sufficient to support the findings of guilty, and Fain does not contend otherwise.

Judgment affirmed.

PREWITT, C.J., HOGAN, P.J., and MAUS, J., concur.