STATE of Missouri, Respondent,

v.

Michael G. HEITMAN, Appellant.

No. 60872.

Supreme Court of Missouri,
En Banc.

Nov. 14, 1979.

Rehearing Denied Dec. 6, 1979.

Thomas J. Cox, Jr., Charles C. Curry, Kansas City, for appellant.

John Ashcroft, Atty. Gen., Robert L. Presson, Asst. Atty. Gen., Jefferson City, for respondent.

RENDLEN, Judge.

■ Michael Heitman, appealing his convictions of burglary second degree, § 560.-045, and stealing, § 560.156, RSMo 1969, contends as error: (1) insufficiency of the proof; (2) improper admission of illegally seized evidence; (3) failure of the trial judge to disqualify on defendant's oral motion made at the opening of trial, and (4) refusal of the trial court to submit an "accomplice" instruction. The Court of Appeals, Western District, ruling only on defendant's second contention, determined that without certain challenged exhibits the evidence was insufficient to convict and ordered defendant discharged.[1] The cause was transferred here and considering the issues as though on original appeal, we affirm.

The facts and inferences supportive of the verdict are these: Following a tip from an anonymous informant, who on more than five occasions had been shown to be reliable and precise, Officers Jackson and Grove of the St. Joseph Police Department commenced a continuing surveillance of the Ronald Oliphant home in that city on July 5, 1976. They had learned from the informant that "Ronnie Oliphant was going to participate in the breakin of some type of pharmaceutical business," and though the time and place were not specified, it was to occur within the week. Acting on that information plus Jackson's personal knowledge that Oliphant, Wolfe, and defendant had been convicted of prior burglaries, the officers went to a place near the Oliphant home about 8:00 p. m. that evening. Driving past the residence in an unmarked vehicle, they observed Danny Wolfe installing in his auto a small square box with lights on the front which the officers recognized as a "police scanner." From a vantage point about one-half block away they saw Wolfe go into the Oliphant house and a few mo-

---

1. Factual questions are of prime importance in the disposition of this appeal and yet neither appellant's original nor supplemental briefs reference transcript pages in the statement of facts. This is unfair to the opponent, offers little assistance to Court and violates the clear mandate of Rule 84.04(h). While we have considered dismissing the appeal or other sanctions it is hoped an admonition will effect compliance with the rule hereafter and remind those employing the appellate system of the need for careful attention to the rules.

ments later Wolfe, with a woman and a child emerged from the house, entered Wolfe's auto and drove away. The officers followed the auto to a house which they believed was Wolfe's parents, where the woman, (apparently Mrs. Wolfe) took the child inside and came out alone. The Wolfes returned to the Oliphant residence and went inside. Continuing their surveillance, the officers saw Danny Wolfe come out, remove the small box from his vehicle and install it in a vehicle owned by Oliphant. He also placed a black object, described as long, narrow, and about ½ inch in diameter in the passenger side of the car. Meanwhile Ronald Oliphant came to the car and put some brown material on the floorboards. Both men returned to the house for ten minutes, then came to the Oliphant car and at about 9:00 p. m. drove away.

The officers followed but soon lost the Oliphant vehicle, and after advising the desk commander, resumed their surveillance of the Oliphant residence. At about 11:15 the Oliphant car returned, pulling into an alley at the rear of the premises. Because the officers could not see it from their vehicle they moved on foot to a yard on the east side of the Oliphant residence, from which they observed Danny Wolfe go into the house. From that position the officers could not see the car so they moved beyond the garage and went into the alley directly behind the Oliphant residence.

From there they could see the car which was about 15 feet away parked athwart the alley with its back toward the house. The trunk was open and the trunk light burning. Inside they could see two broken cardboard boxes containing what appeared to be pill bottles. Oliphant and defendant, who were standing near the trunk wearing brown cloth work gloves (it was warm—75°) reached into the trunk and each picked up one of the boxes. Both boxes had a screwdriver protruding from them and each

contained plastic bottles extending above the top with plastic seals around the lids. Although there is some inconsistent testimony, Officer Jackson repeatedly testified to the similarity of the plastic bottles he viewed and those used in the pharmaceutical trade. When the two men closed the trunk and started toward the house, the officers noticed that each had a flashlight in his pocket.[2]

It was then the officers stepped forth and arrested Oliphant and defendant for "investigation of burglary." Though the officers had no information that a burglary of Dr. Titcomb's office had occurred, they noted a label on one of the cardboard boxes bearing the name and address of a Dr. Titcomb, North Belt Highway in St. Joseph. They also seized the gloves, flashlights and the boxes with their contents which were found to contain capsules of phendimetrazine tartrate.

■ At 11:50 p. m., a crime scene search was conducted at the offices of Dr. Titcomb where four separate doors were found to have been forced open. Near the door to the medicine room in the doctor's private office, small wood chips and boxes were strewn on the floor. In a storeroom at the "back auxiliary doctor's office," were large amounts of broken plaster, and an accumulation of dust under a hole in the wall. In that dust the officers discovered a partial shoe print. About that time a fifth door to a separate storeroom was found to have been forced. Laboratory analysis showed the plaster samples gathered from the scene compared directly with the gypsum material found on the soles of defendant's shoes and gloves. Further it was determined that the screwdriver taken from the box he was carrying when arrested was the one that made the marks on a striker plate at the burglarized premises. No question is raised in defendant's brief and the evidence

---

**2.** Officer Jackson first testified that Oliphant and defendant each had a flashlight in his rear pocket, but later stated, "Mr. Heitman had both flashlights." The parties stipulated that if Officer Grove were to take the stand, his testimony "would be the same as Officer Jackson's."

Which of the two men had the flashlights is of no great moment, the significant fact is that the officers saw the flashlights and recognized their import in a chain of circumstances bespeaking burglary.

is clear that a burglary and a theft of a quantity of the drug phendimetrazine tartrate occurred. Matching invoices from the doctor's records with labels on the boxes provides a clear connection with defendant and his assertion that there is nothing linking him with the burglary of Dr. Titcomb's office is belied by the record. Defendant's claim of insufficiency of the proof is without merit for indeed a strong case was made.

▮ Defendant next contends the officers had no probable cause for arrest and the evidence then seized was inadmissible. A warrantless search and seizure may be justified on one of the established exceptions to the warrant requirement of the fourth amendment to the United States Constitution, and a search conducted incident to a lawful arrest represents one such exception. *Chimel v. California,* 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969); *Carroll v. United States,* 267 U.S. 132, 158, 45 S.Ct. 280, 69 L.Ed. 543 (1925); *Agnello v. United States,* 269 U.S. 20, 30, 46 S.Ct. 4, 70 L.Ed. 145 (1925); *James v. Louisiana,* 382 U.S. 36, 37, 86 S.Ct. 151, 15 L.Ed.2d 30 (1965). An arrest with or without a warrant requires probable cause, which simply means a knowledge of facts and circumstances sufficient for a prudent person to believe the suspect is committing or has committed *an* offense. *Beck v. Ohio,* 379 U.S. 89, 91, 85 S.Ct. 223, 13 L.Ed.2d 142 (1964); *State v. Robinson,* 484 S.W.2d 186, 189 (Mo.1972). It was not necessary that the officers then knew of *the* particular offenses of burglary and stealing at Dr. Titcomb's office. While the quantum of information necessary to fashion probable cause means more than mere suspicion, *Henry v. United States,* 361 U.S. 98, 102, 80 S.Ct. 168, 4 L.Ed.2d 134 (1959); *State v. Hicks,* 515 S.W.2d 518, 521 (Mo.1974), its existence must be determined by practical considerations of everyday life on which reasonable persons act and not the hindsight of legal technicians. *Brinegar v. United States,* 338 U.S. 160, 175, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949); *State v. Wiley,* 522 S.W.2d 281, 287 (Mo. banc 1975). All information known to the officers and the reasonable inferences therefrom bear on the determination of that issue.

▮ It first should be noted that the officers knew defendant as a convicted burglar, more particularly they knew him as a participant with Oliphant and Wolfe in such crimes. It is most significant that the officers received information from a reliable tipster that Oliphant soon would attempt to burglarize a pharmacy. Again it may be said such information standing alone would not provide probable cause, compare *Draper v. United States,* 358 U.S. 307, 79 S.Ct. 329, 3 L.Ed.2d 327 (1959); however it singled out a specific individual (Oliphant) and a specific type of crime (burglary of a pharmacy), as vital concerns for the officers observing the activities at Oliphant's residence on that eventful July 5th evening.

▮ Armed with this information the officers observed Wolfe and Oliphant twice carefully install what the officers believed was a "police scanner" in an auto just before driving away. It may not be seriously argued that the use of a police-radio monitoring device by convicted burglars who have been reported planning a burglary may not have been considered by officers as a fact pertinent to the question of probable cause. At 11:15 p. m.—and late hour is important—the officers observed defendant and Oliphant wearing gloves in warm weather carrying cardboard boxes. The boxes, which have been sent to this Court as part of the record, do not have the sharp edges or sheer mass which in everyday life would impel the use of gloves for carrying. The officers observed that the boxes contained plastic bottles with seals "like a bottle of liquor might have," and those two cartons of bottles did not appear to be over-the-counter drug store items. Also, the presence of screwdrivers and flashlights, ordinary items when considered in isolation but useful in the commission of a burglary after dark, triggered a reasonable response, resulting in the arrest. On this issue the Supreme Court in *Draper v. United States,* 358 U.S. 307, 79 S.Ct. 329, 3 L.Ed.2d 327 (1959), found probable cause to

arrest from less suspicious circumstances than those presented here. In *Draper* a reliable paid informant advised the police that a man with three ounces of heroin would be returning to Denver from Chicago by train on either of two days. The informant detailed the man's physical appearance, his usual gait and the fact that he would be carrying a tan zipper bag. On the second of the days predicted by the informant, a man with the described characteristics was observed departing a Chicago train at the Denver station. He was arrested and found to be in possession of heroin. The Court held that those facts constituted probable cause sufficient to support the arrest and ensuing search. The cumulative force of the suspicion-heightening circumstances in the case at bar makes a much stronger showing of probable cause than the facts at hand in *Draper*. From this we can but say the circumstances provided probable cause for the officers to believe defendant was or had been involved in the commission of a crime.

■ Defendant presses the point that Officer Jackson arrested defendant "for investigation of burglary," and reminds us of this Court's statement in *State v. Hicks*, 515 S.W.2d 518, 522 (Mo.1974): "An arrest not on a legal charge, but for investigation, simply to afford the police officers time and opportunity to investigate and amass facts sufficient to constitute probable cause, is not lawful." In so doing, defendant seeks to turn the officer's phrase into a legal term of art and bind the State to a position depriving the arrest of legal force. However, the officer's subjective belief is not controlling on the question of probable cause, *State v. Epperson*, 571 S.W.2d 260 (Mo. banc 1978), *cert. denied,* —— U.S. ——, 99 S.Ct. 2820, 61 L.Ed.2d 274 (1979), and his characterization of the arrest as investigatory did not negate the circumstances known to him, justifying the arrest. The facts supplying probable cause to arrest were present and whether the officer subjectively so believed or said, is of no real moment. Such statement did not vitiate the valid arrest with its attendant consequence.

■ Defendant also assigns significance to the fact that when the arrest was made the officers did not know a burglary had occurred except from what they observed at the Oliphant residence. Consequently, defendant continues, the officers did not know with certainty a crime had been committed and thus lacked probable cause to arrest. This argument too, misses the mark. It was not necessary for police officers to receive a burglary report to recognize that a burglary had probably taken place. The situation presented to the officers was sufficient to raise in the prudent man a belief that a crime has been committed, and from this probable cause arose. *See State v. Napper*, 381 S.W.2d 789 (Mo.1964). The State sustained its burden and probable cause was sufficiently shown to support the arrest and the subsequent seizure of the challenged evidentiary items.

■ Defendant next assigns error to the trial judge's refusal to disqualify himself on defense counsel's oral motion made during the first day of trial. Rule 30.12,[3] effective at the time of trial in December, 1976, set the terms for disqualification of judges and provided in relevant part:

In any criminal case pending in any circuit court, the judge of said court shall be deemed incompetent and disqualified to hear and try said case when the judge is in anywise interested or prejudiced. . . . The judge shall be disqualified under the provisions of this Rule if, having previously given reasonable notice to the opposite party, the defendant or the prosecuting attorney shall file an affidavit stating the defendant or the state, as the case may be, cannot have a fair and impartial trial by reason of the interest or prejudice of the judge. Said affidavit must be filed not less than five days before the day the case has been set for trial, . . .

3. See Rule 32.14 (effective January 1, 1980) (superseding Rule 30.12).

The record shows that the trial though scheduled for Monday, December 6, 1976, did not commence until Wednesday of that week. The case from the beginning had been assigned to the Honorable Frank Connett and a December trial date had been announced on October 4. At defendant's request a change of venue had been granted from Buchanan County to Clinton County on Friday, December 3, the last working day before trial. The jury was to be called for trial on Monday afternoon, December 6; however defense counsel, who had taken the change, complained on Friday of the transfer to Clinton County and responding to that complaint the court discussed the matter which counsel who stated he "would be satisfied with Platte County." Accommodating defendant the court on Monday, December 6, again transferred the cause, this time to Platte County and it was there the case was tried on Wednesday, December 8. Notwithstanding his abundant opportunity to file the written affidavit required by Rule 30.12, defense counsel [4] admitted he did not so do.[5] When pressed for an explanation why he had waited until the day of trial to make his *oral* motion, counsel stated several times it was a matter of trial tactics; or as he put it, "it was a matter of what you might call tactical strategy." This despite the fact defendant himself stated and counsel conceded defendant had asked counsel "all along" to disqualify the judge. The only explanation counsel was able to give, is the following:

> MR. DUTY: [defense counsel] Because it was my idea to leave the application for the change of venue with Your Honor. I had a feeling that we would probably be assigned to Platte County, and I wanted to stay with the Court until such time as I felt we got a county assigned where we could receive a fair and impartial trial.
>
> THE COURT: You mean you thought I would give you a fair and impartial pick of a county but not a fair and impartial trial? Is that what you mean?
>
> MR. DUTY: In effect, yes.

The trial judge stated in open court, "[I]t is true the defendant has been before me some five times. I think one time he plead [sic] guilty and another two times he was convicted and another two times he was acquitted. The Court doesn't feel it has any bias or prejudice against the defendant personally." In view of this statement coupled with the court's lenient accommodation of defendant's wishes us to change of venue, plus counsel's explanation of the delay in seeking disqualification, and his failure to comply with Rule 30.12, we find no merit in defendant's claim of error.

Finally, defendant avers the trial court erred in failing to give MAI–CR 2.10 on responsibility for the criminal conduct of others, especially paragraph two thereof.[6] This deprived him of an instruction on a key element of his defense, he continues, for the State's evidence did not "put Appellant closer to the scene of the burglary than the home of Ronald Oliphant," and "That Appellant was, at most, an aider and encourager is the essence of Appellant's defense." His argument ignores the evidence and reasonable inferences linking defendant with the doctor's office, including the sole print, the matching gypsum dust from his gloves and shoes, the possession of the screwdriver used in the burglary and his possession of the loot from the burglarized premises. If we assume not giving this instruction was error (and it was

---

**4.** Trial counsel withdrew after post-trial filings and new counsel represents Heitman on appeal.

**5.** Defendant claimed that on the afternoon of December 3, he "indicated" he wanted to file application for disqualification of judge but the *court* refuted this stating "you never said anything about disqualifying the judge" and defense counsel finally stated, "I accede to that"

but then claimed he mentioned that intention to the prosecutor on that afternoon.

**6.** Paragraph two of MAI–CR 2.10 reads, "The presence of a person at or near the scene of an offense at the time it was (committed) (attempted) is alone not sufficient to make him responsible therefor, although his presence may be considered together with all of the evidence in determining his guilt or innocence."

not) no prejudice resulted. Rule 20.02(e).[7] The case was submitted to the jury under instructions permitting a guilty verdict on the jury's finding that defendant personally broke into and entered Dr. Titcomb's office with intent to steal therefrom and that defendant stole certain property. No theory of responsibility for the actions of others was mentioned. To have given MAI–CR 2.10 together with one of the verdict-directors on joint action or aiding and abetting (MAI–CR 2.12 and 2.14) would have expanded the scope of the jury's deliberations by allowing them to render a guilty verdict based on defendant's collaboration with Oliphant and Wolfe. It is only conjectural whether the beneficial effect of the second paragraph of MAI–CR 2.10 would have outweighed the detriment to defendant in giving the jury wider grounds on which to predicate guilt, accordingly defendant's final claim fails.

The judgment of the circuit court is affirmed.

BARDGETT, C. J., and DONNELLY, SEILER, WELLIVER, and MORGAN, JJ., concur.

HIGGINS, J., not participating because not a member of the Court when cause was submitted.

---

7. See Rule 28.02(e) (effective January 1, 1980) (superseding Rule 20.02(e)).