**STATE of Missouri,
Plaintiff-Respondent,**

v.

**Daniel Albert SALKIL,
Defendant-Appellant.**

No. 13099.

Missouri Court of Appeals,
Southern District, Division Four.

March 29, 1983.

Motion for Rehearing or to Transfer to Supreme Court Denied April 15, 1983.

Application to Transfer Denied
May 31, 1983.

---

1. All references to rules are to Missouri Rules of Court, V.A.M.R.

John D. Ashcroft, Atty. Gen., Kelly Klopfenstein, Nancy K. Baker, Asst. Attys. Gen., Jefferson City, for plaintiff-respondent.

Donald R. Cooley, Springfield, for defendant-appellant.

GREENE, Chief Judge.

Defendant, Daniel Albert Salkil, was jury-tried and convicted of the crime of capital murder, § 565.001, RSMo 1978, and was sentenced to life imprisonment without eligibility for parole prior to serving a minimum of fifty years of the sentence. The event precipitating the filing of the capital murder charge against Salkil was the strangulation slaying of his estranged wife, Janelle.

Viewed in the light most favorable to the state, the evidence adduced at trial, and the legitimate inferences to be drawn therefrom, constituted proof, beyond a reasonable doubt, that on August 5, 1980, defendant unlawfully, willingly, knowingly, deliberately, and with premeditation, killed Janelle Salkil by strangling her with a drapery cord, thus proving all of the elements of capital murder.

On appeal, defendant's first point alleges that it was prejudicial error for the trial court to overrule his motion to suppress, and to admit into evidence the testimony of state's witness Virgil Marcum. The testimony of Marcum concerned incriminatory statements made by Salkil in the presence of Marcum when they were inmates in the Webster County jail. Defendant contends that Marcum was a paid police informant; that Marcum had elicited the incriminatory statements from him at the request of Detective John Smith of the Springfield, Missouri Police Department *after* Salkil had told Smith that he did not wish to answer any further questions concerning his wife's death, and therefore, such questioning by Marcum, under these circumstances, violated his constitutional rights granted by the Fifth and Sixth Amendments to the United States Constitution.

In order to adequately discuss the legal issues leading up to this claim of error, it is necessary to outline the facts leading up to the introduction into evidence of Marcum's testimony. On August 5, 1980, between the hours of 10 a.m. and 5 p.m., Janelle Salkil was murdered in an apartment in Springfield, Missouri she shared with her brother, Jeff Trivett. Jeff discovered Janelle's body upon his return home after work, and immediately called the Springfield police. The police came to the crime scene and commenced an investigation headed by Detective Sergeant Walter Ayres. Within a short time, the police had the following information:

1) Janelle had been killed by strangulation. The instrument used was a small caliber cord, matching the pull cord on drapes in the apartment. The cord was knotted around Janelle's neck so tightly that it was imbedded one-half to one inch into her neck, and had to be pried out of her neck before it could be cut for removal.

2) There were no signs of struggle in the apartment, and all doors and windows were secure when Jeff came home from work.

3) Janelle and the defendant were separated.

4) Defendant had been seen in the vicinity of the apartment a day or two before Janelle's death.

5) Defendant was heavily bearded and wore a mustache.

6) Defendant had a violent disposition, having threatened to kill Janelle's brother, or to break his legs.

7) On two different occasions, a few days prior to the slaying, notes addressed to Janelle were pushed under the apartment door. One note was written and the other was printed. The printed note was on brown paper that looked like it had been torn from a paper bag and said, "You have hurt a very dear friend. I have my friend under lock and key. Your enemy." Janelle had recognized the handwriting and printing on the notes as that of the defendant.

8) When Jeff left for work on the morning of August 5, the notes were on the kitchen table in the apartment. When Jeff returned from work that evening, and found that his sister was dead, the notes were missing.

Based on this information, the police issued a pick up order for Daniel Salkil. Information that the police wanted to question Salkil reached the Springfield Daily Newspaper, which then published that information along with a story of the crime. At approximately 8 a.m. on August 6, the day following Janelle's death, defendant went to the Springfield Police Department, showed Sam Barber, the desk officer, a newspaper containing the story of Janelle's death, and said, "I think you want to talk to me." Salkil was clean shaven at this time. Barber took Salkil to Sergeant Ayres, who advised defendant that he was under arrest for capital murder. Salkil was booked, his

clothing and boots were taken from him for testing, and fingernail scrapings and a blood sample were taken from him.

Salkil was then taken to Detective John Smith. Smith advised Salkil of his preinterrogation rights, as mandated by the case of *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Salkil indicated he understood his rights and executed a rights waiver. Smith then began to question defendant. Salkil told Smith that he had put notes under Janelle's door in the two or three days prior to August 5, that he had lunched with Janelle on August 4, that he had been sleeping in parks the past several weeks, and that he had shaved off his mustache the night of August 5. Smith then asked Salkil why he had shaved off his mustache, at which time Salkil declined to answer any further questions and said he wanted a lawyer. Salkil was not questioned further by Detective Smith or any other police officer.

Salkil was released from the custody of the Springfield police and was not charged with the murder of his wife. He was then transferred to the Webster County jail to face felony charges there unrelated to the death of Janelle Salkil. While in jail, Salkil became acquainted with Virgil Marcum, who was his cell mate. Marcum, unbeknownst to Salkil, was a police informant for the Missouri State Highway Patrol, and had been hired to assist the patrol in undercover drug investigations. While engaged in such endeavor, Marcum wrote a number of bad checks, and was jailed on Webster County felony check charges on November 1, 1980.

On or about November 15, Marcum overheard Salkil tell Clyde Smith, another jail inmate, "that he had to have his wife killed because she was testifyin' in a drug case." That afternoon, while Marcum was being transported to Pettis County to face check charges there, he told Corporal Tom Martin of the highway patrol about the conversation that he had heard between Salkil and Smith. At the suppression hearing, Marcum said the reason he did this was "it might secure my release—you know it might help me with my case."

The information regarding Salkil's statement to Clyde Smith was relayed to Springfield Detective John Smith. On November 25, after Marcum was returned from Pettis County, he was contacted by Detective Smith. Smith told Marcum that he would appreciate any further information Marcum might receive about the murder of Janelle. Marcum was then placed back in the cell with Salkil. On November 26, while berating his girl friend about alleged infidelity, Marcum asked Salkil, "Have you ever thought of killing a bitch?" Salkil replied, "Yeah, I have." Salkil then said, "Yeah, I took the bitch out ... but I don't think they can make a case on me." Salkil then told Marcum about going to the police department the day after Janelle's death; that the police had canvassed a ten-block area around Janelle's apartment with pictures of Salkil but that no one could put him at the crime scene the day of the murder, and that when the police questioned him about notes left in the apartment, but could not produce the notes, "Well, I knew I had it beat right then."

In subsequent conversations with Marcum, Salkil said that on the morning of August 5, he borrowed a car and went to Janelle's apartment about 10:45 a.m. Before going, he had shaved off his beard, and had tied up his long hair under a yellow John Deere cap. The purpose of the trip was "either gettin' her back to me or takin' her out." When Janelle refused to reconcile, Salkil strangled her, using a drapery cord from one of the windows. Salkil said he then straightened up the apartment, locked all of the apartment doors, and went to a local restaurant where he shaved off his mustache with a razor he had taken from the apartment. This information was given to Detective Smith. Salkil was then charged with the murder of his wife and Marcum testified at trial regarding the incriminatory statements Salkil had made to him regarding the killing of his wife. Marcum's testimony was devastating to Salkil's defense. There was no evidence that the Springfield police paid anything to Marcum

for his information, or that they offered him anything of benefit, such as a favorable recommendation on his check charges, in return for his information and testimony.

Defendant bases his claim of constitutional error on alleged violations of his right to counsel (Sixth Amendment) and his right against self-incrimination (Fifth Amendment). He relies on *United States v. Henry,* 447 U.S. 264, 100 S.Ct. 2183, 65 L.Ed.2d 115 (1980) as support for his Sixth Amendment claim, and on *Edwards v. Arizona,* 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981) as authority for his contention that his Fifth Amendment rights were violated. Those authorities are not applicable under the facts in this case.

In Henry, the defendant had been indicted for bank robbery and was represented by counsel on the robbery charge. Government agents advised their informant, who was a cell mate of Henry, to be alert as to any statements made by Henry concerning the robbery. Henry made statements to the informant concerning the robbery, and the informant testified for the government about the statements made to him. The supreme court ruled that, under those circumstances, the use of inculpatory statements by a defendant made to an informer-cell mate, who relayed that information to a government agent, violated Henry's Sixth Amendment right to counsel, reasoning that the use of informants in such circumstances were likely to induce uncounseled incriminating statements.

In Edwards, the defendant had been charged with the crimes of robbery, burglary, and first degree murder. While being interrogated by an officer at the police station, after waiving his *Miranda* rights, Edwards gave a taped statement presenting an alibi defense. Edwards then attempted to make a deal with the police officer, but the officer said he could not make any deals and referred Edwards to the county prosecutor. Edwards tried to call the prosecutor, but hung up and requested an attorney before making a deal. Questioning ceased and Edwards was jailed. But the next morning, two detective colleagues of the officer who had previously interrogated Edwards went to see Edwards, although he had said he did not wish to see anyone. The officers identified themselves and read Edwards his *Miranda* rights. Edwards eventually gave an incriminatory statement. The supreme court ruled that the second questioning, after Edwards had asserted his Fifth Amendment rights, was in violation of those rights. The information received by the second interrogation concerned the crimes for which Edwards had been indicted.

■ The facts here are decidedly different than those in *Henry* and *Edwards.* Salkil had not been charged with the murder of his wife when he talked to Marcum. He was in the custody of Webster County authorities on unrelated charges. Under those circumstances, the request of Detective Smith that Marcum advise him of any statements made by Salkil regarding the slaying of his wife did not violate Salkil's Fifth or Sixth Amendment rights. *Hoffa v. United States,* 385 U.S. 293, 87 S.Ct. 408, 17 L.Ed.2d 374 (1966). A case precisely in point on the facts of this case is *State v. Lowry,* 37 Or.App. 641, 588 P.2d 623, 630 (1978). In that case, it was held that the use by police of an informant (fellow inmate) to interrogate a suspect who is jailed on a charge unrelated to the matter under investigation does not violate the suspect's constitutional rights. Other cases of similar import are *United States v. Calhoun,* 669 F.2d 923, 925 (4th Cir.1982), cert. denied, 456 U.S. 946, 102 S.Ct. 2014, 72 L.Ed.2d 469 (1982); *United States v. Missler,* 414 F.2d 1293, 1302 (4th Cir.1969), cert. denied, 397 U.S. 913, 90 S.Ct. 912, 25 L.Ed.2d 93 (1970); *United States v. Diamond,* 492 F.Supp. 583, 586 (D.Md.1980), aff'd., 660 F.2d 996 (1981), cert. denied, 454 U.S. 1156, 102 S.Ct. 1029, 71 L.Ed.2d 313 (1982); and *Harper v. State,* 249 Ga. 519, 292 S.E.2d 389, 397–398 (1982). See also *State v. Buckles,* 636 S.W.2d 914 (Mo. banc 1982) for discussion of the issues.

Defendant's counsel has not cited us a single case and we find none that contradicts the rationale set forth in *State v.*

*Lowry,* supra, and the cases listed thereafter in this opinion supporting the *Lowry* rationale.

During argument before this court, defense counsel cited *Crawford v. Alabama,* 377 So.2d 145 (Ala.Ct.Cr.App.1979), judgment vacated and remanded, 448 U.S. 904, 100 S.Ct. 3044, 65 L.Ed.2d 1134 (1980), remanded, 405 So.2d 702 (Ala.1981), reversed, 405 So.2d 702, 703 (Ala.Ct.Cr.App.1981) as support for his position that *United States v. Henry,* supra, applies in cases where the suspect is in custody on an unrelated felony. The argument is devoid of merit. *Henry* was never applied in *Crawford. Crawford* was reversed and the cause remanded to the trial court for a new trial because of the trial court's failure to give instructions on a lesser included offense in a first degree murder case as required by *Beck v. Alabama,* 447 U.S. 625, 100 S.Ct. 2382, 65 L.Ed.2d 392 (1980). There is nothing in the opinion of the Supreme Court of Alabama, or the subsequent opinion of the Court of Criminal Appeals of Alabama, both opinions being published after remand by the Supreme Court of the United States, that even remotely suggests that the *Henry* doctrine applies to conversations between an in-jail informant and a suspect who is in jail on a charge unrelated to a crime that is the subject matter of the conversations. The point is denied.

Defendant's second and third points relied on contend that the trial court erred in failing to suppress his motions to exclude from evidence a carpet fiber taken from Salkil's boot by the police and statements made by Salkil to Detective Smith after defendant's arrest. He argues that there was no probable cause for his arrest and, therefore, a subsequent search of his clothing, the seizure of a newspaper he was carrying, and the elicitation of statements from him by Detective Smith were illegal.

The carpet fiber, which compared favorably with fibers taken from the living room carpet in Janelle's apartment, the newspaper which contained an article concerning Janelle's murder and a statement that the police were looking for Salkil, and Salkil's

admission to Smith, before he availed himself of his *Miranda* rights, that he had left notes at Janelle's apartment were all used as evidence by the state.

 Probable cause to arrest without a warrant "simply means a knowledge of facts and circumstances sufficient for a prudent person to believe a suspect is committing or has committed an offense." *State v. Heitman,* 589 S.W.2d 249, 253 (Mo. banc 1979). Its existence must be determined by practical considerations of everyday life on which reasonable persons act, and not on the hindsight of legal technicians. *State v. Goodman,* 608 S.W.2d 498, 500 (Mo.App.1980). Based on these principles, the Springfield police had probable cause to arrest Salkil on August 6, 1980. They knew Salkil and his wife were having domestic discord, knew he had left notes at her apartment which were missing after her death, and knew, since the apartment was secure and she was clad in a nightgown when found, that she knew the killer and had let him into her apartment. These related facts were sufficient to justify Salkil's arrest.

Once probable cause was established, the seizure of Salkil's clothing, boots and the newspaper was justified as being incident to a lawful arrest [*State v. Goodman,* supra, at 500], and the questioning of Salkil by Detective Smith, after Smith had advised defendant of his *Miranda* rights and Salkil had signed a rights waiver, was also justified. *State v. Kelley,* 473 S.W.2d 707, 710 (Mo.1971). Points two and three are denied.

 Salkil's fourth point relied on is that the trial court erred in permitting a late endorsement of state's witness Jerry Evans and in denying defendant a continuance to investigate Evans' background. Salkil's trial commenced on July 20, 1981. The first time that the prosecuting attorney knew that Evans would testify as a state's witness was July 17, which was a Friday. The next day, the prosecuting attorney notified defense counsel that Evans would testify as a state's witness. Defense counsel was also informed of the general nature of Evans'

testimony. Evans did not testify until July 22, 1981.

Evans was an inmate of the Greene County jail, as was Salkil, Marcum (being held on Greene County check charges), and Kenneth Crenshaw. Evans testified that on June 6 or 7, 1981, he overheard Salkil tell Crenshaw "something about a fight with Jan—that it was an accident and he was sorry" and that "he thought he could get out of it pretty easily." Crenshaw was called as a defense witness and denied any such conversation with Salkil.

Defense counsel interrogated Evans in jail on July 18, 1981. He also talked to Crenshaw and, in fact, used Crenshaw as a defense witness. The state notified defense counsel that they intended to use Evans as a witness as soon as they knew he would testify, which was two days before trial and four days prior to Evans' testimony at trial. This was adequate notice, under the circumstances, so Salkil could not be prejudiced by the endorsement of Evans as a witness. *State v. Durham,* 418 S.W.2d 23, 27 (Mo. 1967). In addition, Salkil has not made any showing of prejudice. Defense counsel interviewed Evans, secured testimony to refute Evans' statements, and secured admissions from Evans that could affect his credibility. It was a matter of judicial discretion as to whether the late endorsement and testimony of Evans should have been allowed. The trial court did not err in permitting the endorsement and testimony under the facts here. See *State v. Strawther,* 476 S.W.2d 576, 580 (Mo.1972). The point is denied.

Defendant's fifth point is that the trial court erred in failing to grant a new trial because of newly discovered evidence. The newly discovered evidence is alleged to be testimony from jail inmates Terry Gilbert and Kenneth Crenshaw that while they were in the juvenile tank of the Greene County jail in March of 1981, Virgil Marcum, who was in the same cell, told them he was going to testify against Salkil; that Salkil had never told him he had killed his wife but that Marcum was going to use that story to help him "get out of some charges." It is noteworthy that Crenshaw, used as a witness by the defense, did not make such statements at trial, nor was Gilbert produced as a witness at that time.

Defendant also contends, via affidavit by his attorney, that Jerry Evans lied at trial because of fear of Virgil Marcum, and that he had witnesses to prove it. The names of the alleged witnesses were not revealed in the affidavit.

■ The matter of granting a new trial on the basis of newly discovered evidence is within the broad discretion of the trial court. The trial court's decision denying a new trial on that ground should not be disturbed if the alleged new evidence is cumulative, or where it is not so material as likely to produce a different result. *State v. Tyler,* 587 S.W.2d 918, 928 (Mo.App.1979). In making its evaluation, the trial court should not order a new trial unless the "newly discovered evidence" is credible enough that it probably would produce a different result. *State v. Noble,* 591 S.W.2d 201, 207 (Mo.App.1979).

■ Gilbert and Crenshaw now claim that they knew in March of 1981 that Marcum told them he was going to perjure himself in Salkil's trial to be held in July of 1981, yet they did not tell Salkil, who they are now trying to help, and did not tell Salkil's attorney, who knew at the time of trial that at least Crenshaw was ready, willing and able to help Salkil. The alleged witnesses to Evans' alleged perjury are unnamed. From these facts, the trial court could have easily found that the alleged new evidence was not credible and therefore, not material. There was no abuse of discretion on the part of the trial court in denying defendant's motion for new trial on the basis of newly discovered evidence. The point is denied.

■ In his sixth point, defendant claims that subsequent to trial his attorney discovered that an unnamed juror did not disclose that she had obligated herself, on behalf of a family member, to pay legal fees to Salkil's attorney, but had failed to pay such fees. He claims that if she had

disclosed such business dealings, he would have challenged the juror for cause.

Missouri case law, at a minimum, requires that a defendant, in his motion for new trial based on the concealed bias of a juror, must 1) allege and show *intentional concealment* by the juror of the facts and 2) provide an affidavit from the juror in which the facts showing bias are revealed. See *State v. Coy,* 550 S.W.2d 940, 942 (Mo.App. 1977). Salkil's motion failed to do this, and also failed to name the juror and establish the nature and extent of the alleged debt. The point has no merit and is denied.

Defendant's seventh point relied on is claimed trial court error in overruling his motion for judgment of acquittal filed at the time of trial because the state failed to present any expert testimony as to the cause of Janelle Salkil's death. He argues that the state must prove the cause of death was not self-inflicted nor due to natural causes or accident, and that since no expert opinion evidence was submitted, there was no evidence from which jurors of average intelligence would know from their own experience or knowledge what killed Janelle Salkil. This argument has no merit whatsoever.

Expert opinion evidence is not the only method to establish the cause of death. Circumstantial evidence may be used to prove death in unlawful homicide cases where the evidence is such that any person of average intelligence would know from experience or general knowledge that a wound or manifestation of injury was not self-inflicted or accidental. See *State v. Brandt,* 467 S.W.2d 948, 951 (Mo.1971). Here, police officers at the scene, as well as a paramedic who answered an ambulance call, viewed the body. Clear photographs of the body were introduced at trial and examined by the jury. The evidence, when viewed as a whole, showed that Janelle's body was injury-free, except for a drapery cord wrapped and knotted so tightly around her neck that it was imbedded into the skin of her neck to such an extent that it had to be pried out to cut it, and a bloody froth or foam was coming from her nose. The evi-

dence conclusively established that she died as a result of being strangled. When coupled with the fact that a second piece of material, consisting of a cloth torn from a bedsheet in Janelle's bedroom, had been tied around Janelle's neck on top of the drapery cord, the evidence tended to prove that Janelle was strangled deliberately and with the intent that she should die. To even suggest that under these facts the jury could have found that Mrs. Salkil had committed suicide or died accidentally borders on the ludicrous. The point is denied.

Defendant's eighth and last point alleged a failure by the state to prove the corpus delecti of the crime of capital murder. He argues that, absent the admissions of Salkil, there was no evidence of capital murder, and that even if such admissions were considered, the state did not make a submissible case.

We have ruled earlier in this opinion that Salkil's admissions made to Marcum and those overheard by Evans were admissible. The evidence outlined herein, exclusive of Salkil's admissions, established that Janelle Salkil had been deliberately and premeditatedly killed by someone. Marcum's testimony established that the someone was Daniel Albert Salkil. The point is denied.

We have carefully reviewed the transcripts, exhibits and legal file in this case. There was sufficient evidence to support the jury's verdict, and we find no error in any rulings or orders of the trial court.

Judgment affirmed.

TITUS, FLANIGAN and PREWITT, JJ., concur.