**STATE of Missouri, Respondent,**

v.

**Patrick A. BUDGETTS, Appellant.**

**No. WD 41125.**

Missouri Court of Appeals,
Western District.

May 30, 1989.

Joseph H. Locascio, Sp. Public Defender, Mark R. Bollinger, Asst. Sp. Public Defender, Kansas City, for appellant.

William L. Webster, Atty. Gen., Jefferson City, Philip M. Koppe, Asst. Atty. Gen., Kansas City, for respondent.

Before KENNEDY, C.J., GAITAN, J., and CONNETT, Special Judge.

GAITAN, Judge.

Appellant, Patrick A. Budgetts, appeals the trial court's decision to overrule his motion to suppress the search of his home and seizure of physical evidence without a warrant. He contends that he was denied his protection against unreasonable searches and seizures as guaranteed by the fourth amendment to the United States Constitution and Article I, section 15 of the Missouri Constitution. Appellant alleges that the search and seizure does not fall within any of the well-recognized exceptions to the warrant requirement.

We affirm the judgment of the trial court.

Appellant was convicted of receiving stolen property with a value of at least $150, a class C felony, section 570.080, RSMo 1986, following a jury-waived trial that was held on January 21, 1988. On September 23, 1988, appellant was sentenced by the Honorable Lee E. Wells to five years' imprisonment.

At the time of appellant's arrest on August 7, 1987, he was on parole from felony convictions for burglary in the second degree and stealing property with a value of $150 or more. On April 7, 1986, appellant was sentenced to concurrent three-year terms of imprisonment pursuant to those convictions. On July 21, 1987, a warrant for appellant's arrest was issued on the ground that he had violated the conditions of that parole.

At approximately nine o'clock on the morning of August 7, 1987, Sergeant Bill Conroy, along with Officers Harlow, Harris, Campo and Ludwig, went to an address at 5140 Woodland to arrest appellant on the parole violation warrant and numerous city warrants after receiving information from another officer that appellant was residing there.

After the other officers surrounded the perimeter of the house, Sergeant Conroy, together with Officer Harlow, went to the

front door and announced their presence as police officers. Sergeant Conroy heard muffled sounds and footsteps but no one answered the door, even though he continued to bang on the door. When the occupants continued to refuse to answer the door after five minutes, Sergeant Conroy broke down the door and entered the residence, together with Officer Harlow. Sergeant Conroy was met by Jacqueline Budgetts, appellant's mother, who was dressed in her night clothes. He informed her that they were there to arrest her son, but she denied he was there.

Sergeant Conroy and Officer Harlow then began to look inside the house to search for appellant. Sergeant Conroy explained that he did a general cursory search, just going from room to room, to ascertain if the person sought is in view. During the course of their cursory search, Sergeant Conroy entered the northeast bedroom of Mrs. Budgetts' home and observed coats and suit coats with the arms hanging down the side of the bed, partially covered with a blanket. Sergeant Conroy also observed that the tags were still on the coats. When he threw back the blankets of the bed to see if there was a body under there, he was able to observe more thoroughly that there was a number of them there and that they appeared to be brand new.

After their cursory search of the entire residence did not result in the discovery of appellant, Sergeant Conroy and Officer Harlow proceeded to perform a more thorough search of each room in the house. They re-entered the northeast bedroom and lifted up the mattress in order to look for a cut-away in the box springs, where someone could hide. As the result of their investigation, they again disturbed the bed and some of the coats that were on the bed ended up scattered on the floor.

Sergeant Conroy said that the coats appeared to be new and he noticed that they were all on the hangers, and appeared like you get them right out of the store. Most of the coats, he said, "had price tags dangling" and "[y]ou could tell the brand names and stuff hanging there." Sergeant

Conroy also noticed that several of the coats were of the same style and designs, which was unusual since most people only buy one coat, and do not buy three or four of the same kind.

When this more thorough search of the northeast bedroom failed to turn up any signs of appellant, the two officers returned to do a more complete search of the northwest bedroom. There, they found appellant hiding in a closet under approximately three and one-half feet of clothing. Sergeant Conroy grabbed appellant by his right toe, but appellant refused to come out of the closet until the sergeant yelled out, "Bring the dogs in here." Appellant quickly had a change of heart, exited the closet, and was arrested.

Suspecting that the coats on the bed were stolen, Sergeant Conroy asked one of his officers to ask appellant about what size coat he wore, but appellant gave no answer. Before re-entering the northeast bedroom, Sergeant Conroy asked Mrs. Budgetts if she knew anything about the coats. Mrs. Budgetts indicated that the northeast bedroom was Patrick's room and that she did not know anything about the coats and that she had no control over Patrick and what he did. According to Sergeant Conroy, she then said she was not responsible for Patrick; and if there was anything wrong with those coats, to get them out of here, she did not want anything to do with anything. Sergeant Conroy stated that Mrs. Budgetts specifically told him to get the coats out of the residence.

Sergeant Conroy then re-entered the bedroom and obtained the brand names and sizes from the labels and tags on the coats. He discovered that the coats ranged from size 40 to 46 and had come from Montgomery Ward. He called the Metro Burglary Unit and, after talking with a detective, discovered that a burglary had recently occurred at Montgomery Ward, and that the coats matched the description of some of the items that had been taken in that burglary. The coats, three Highland Park men's suit coats, three Hill and Archer gray suede leather waist-length coats, and one Hill and Archer gray leather waist-

length coat, were then seized and taken to the Metro Patrol Division Station, along with appellant.

On August 7, 1987, appellant was interviewed by Officer James Komoroski. Appellant told Officer Komoroski that he and a friend named Curtis were driving down Paseo and saw a plastic bag on the side of the road which contained the coats. After this friend took appellant home, appellant said that he took the bag into his mother's house, opened it up, and saw that the coats had tags on them from Montgomery Ward. He stated that even though he thought the coats were stolen, he decided to sell them because he needed the money.

The parties stipulated that the coats which were seized by the police had been part of the property stolen in a burglary that had occurred in the early morning hours of August 6, 1987, at a Montgomery Ward store at 8627 State Line in Kansas City, and had a combined value in excess of $150.

Mrs. Budgetts, testifying for the defense, said that she owned the residence at 5140 Woodland, and that appellant stayed in the northeast or front bedroom of the house. When asked if she had access to his bedroom, she said, "Well, I could but I don't." The northeast bedroom, she said, was the space of appellant and any of her other children that come home. She was then asked the following questions:

Q. But this room where the coats were found, that is Patrick's bedroom; is that right?

A. Uh-huh.

Q. And do you ever have reason to be in there?

A. None at all because I don't have anything in there that personally belongs to me, nothing.

Q. Only he has access and control of that room; is that right?

A. Him and any other children that have to have that room. It's the same privilege to him as all the rest of them.

When she was asked if her son paid rent on the room, she responded, "Yes, they all do. It is a compulsory thing. Each one

has to pick up the utility." She explained that the northeast bedroom served as a spare bedroom for any of her children who needed a place to stay, and said that, at the time of trial, her daughter was staying in that room.

Mrs. Budgetts denied saying anything to the officers concerning the coats and said she did not tell anybody to take anything.

The sole issue presented by this appeal is whether the trial court erred in refusing to suppress the stolen suit coats and jackets seized by the police from the home in which appellant was arrested and in failing to suppress appellant's subsequent incriminating oral statements made to the police shortly after his arrest. Generally, a search infringing upon individual privacy requires a warrant based on probable cause. *Oliver v. United States*, 466 U.S. 170, 104 S.Ct. 1735, 80 L.Ed.2d 214 (1984). However, there are exceptions to the general rule, two of which are the "plain view" doctrine and consent.

The "plain view" doctrine exception to the warrant requirement permits police to seize items without a warrant if: (1) the initial intrusion is proper; (2) discovery of the evidence is inadvertent; and (3) the incriminating nature of the evidence is immediately apparent. *Texas v. Brown*, 460 U.S. 730, 736–43, 103 S.Ct. 1535, 1540–43, 75 L.Ed.2d 502 (1983).

Appellant relies on *Arizona v. Hicks*, 480 U.S. 321, 107 S.Ct. 1149, 94 L.Ed.2d 347 (1987) in asserting that movement of the coats in appellant's bedroom required probable cause. In *Hicks*, a man was injured by a bullet fired through the floor of the apartment above him. The police arrived and entered this upper apartment to search for the shooter, other victims and weapons. They found and seized three weapons. The police also noticed sets of expensive stereo equipment which seemed out of place in the poverty-level apartment, which they suspected to be stolen. The officers moved some of the components in order to read their serial numbers. The numbers were reported by telephone to police headquarters, and a turntable was seized after

the officers were advised that it had been taken during an armed robbery. Other serial numbers were later matched to components taken in that same robbery, and a warrant was obtained and executed for seizure of that equipment. The court held that the movement of the equipment by the police was a search which was separate and distinct from the initial search for the shooter and weapons. *Id.* at 324–25, 107 S.Ct. at 1152. However, the search was deemed unreasonable because the police lacked probable cause to conduct the second search. Probable cause is required, which means that the incriminating nature of the item must be immediately apparent.

*Hicks,* however, is not controlling in the case at bar. Here, the police were conducting a search of the home of appellant's mother pursuant to a valid arrest warrant for a parole violation and numerous city warrants. The police were aware that appellant was on parole for burglary. Therefore, the officers clearly had the limited authority to enter appellant's residence to execute a warrant for his arrest, forcibly enter when no one answered, and once lawfully inside could properly seize evidence they discovered in plain view. *United States v. Shurn,* 852 F.2d 366, 367 (8th Cir.1988). It is also clear that the discovery of the stolen coats by the police was totally inadvertent in that the coats were found while they searched for appellant himself, during both the cursory and the more thorough searches. Consequently, the first two requirements for the "plain view" doctrine exception were met.

■ The dispositive issue in the case at bar is whether the police had probable cause to believe that the items in question were evidence of a crime or were contraband prior to the third and final entry into the bedroom where the coats were discovered. *Hicks,* 480 U.S. at 323, 107 S.Ct. at 1151. Absent probable cause, the police may not conduct even a cursory physical examination of the object by deliberately moving or rearranging it in order to view those parts of the object that are concealed. *Id.* at 326, 107 S.Ct. at 1153.

The facts and circumstances as they appeared to the police during their first two entries into the bedroom while searching for appellant were sufficient to warrant a person of reasonable caution that the coats were contraband or stolen property. Probable cause means more than mere suspicion, but it does exist "where the facts and circumstances within the knowledge of the seizing officers, and of which they have reasonable trustworthy information, are sufficient in themselves to warrant a man of reasonable caution in the belief that an offense has been or is being committed." *State v. Patterson,* 624 S.W.2d 11, 14 (Mo. 1981) (quoting *State v. Hornbeck,* 492 S.W.2d 802, 805 (Mo.1973)). Probable cause requires a police officer to have "knowledge of facts which create a reasonable belief that the articles seized offend against the law." *State v. Achter,* 512 S.W.2d 894, 904 (Mo.App.1974). The existence of probable cause to arrest "must be determined by practical considerations of everyday life on which reasonable persons act and not the hindsight of legal technicians." *State v. Smith,* 681 S.W.2d 518, 521 (Mo.App.1984) (quoting *State v. Heitman,* 589 S.W.2d 249, 253 (Mo. banc 1979)). The police knew that appellant was on parole from previous convictions for burglary and stealing. They found nine brand new coats, all with their price tags still attached. Under these circumstances, the officers had probable cause to believe that the coats were stolen. Therefore, as the coats were in plain view and their discovery was inadvertent, the officers had authority to seize the coats under the "plain view" doctrine. Additionally, the *incriminating* oral statement given by appellant shortly after his arrest was properly admitted into evidence because the statement was not the tainted fruit of an unlawful arrest or unattenuated fruit of an unlawful search and seizure. *But cf. State v. Blair,* 691 S.W.2d 259, 262–64 (Mo. banc 1985). Therefore, the trial court was correct in not suppressing the stolen coats as evidence, and the subsequent incriminating oral statement made by appellant.

Since the requirements of the "plain view" doctrine exception were met, it is not necessary to consider the issue of consent.

The judgment of the trial court is affirmed.

All concur.